THOMAS C. HUNT AND ANOTHER v.
NEVADA STATE BANK AND OTHERS.
THE FIRST NATIONAL BANK OF ST. PAUL,
THIRD-PARTY PLAINTIFF.
DON F. ROBERTS AND ANOTHER, THIRD-PARTY
DEFENDANTS.
MURPHY FINANCE COMPANY, THIRD-PARTY
PLAINTIFF.
PIONEER CASUALTY COMPANY AND OTHERS,
THIRD-PARTY DEFENDANTS.
THOMAS C. HUNT AND ANOTHER v. FIDELITY
AND DEPOSIT COMPANY OF MARYLAND.
NEVADA STATE BANK AND OTHERS,
THIRD-PARTY DEFENDANTS.
THE FIRST NATIONAL BANK OF ST. PAUL,
FOURTH-PARTY PLAINTIFF.
DON F. ROBERTS AND ANOTHER,
FOURTH-PARTY DEFENDANTS.
MURPHY FINANCE COMPANY, FOURTH-PARTY
PLAINTIFF.
PIONEER CASUALTY COMPANY AND OTHERS,
FOURTH-PARTY DEFENDANTS.*

172 N. W. (2d) 292.

October 22, 1969—Nos. 41697-41703, 41855-41857, 41884, 41885.

---

\* Certified to the United States Supreme Court January 12, 1970.

*Douglas M. Head,* Attorney General, and *Clay R. Moore,* Special Assistant Attorney General, for Thomas C. Hunt.

*Clay R. Moore,* for Frank R. Montgomery.

*Henson & Webb, Robert F. Henson,* and *Walter Richey,* for Don F. Roberts, Edward M. Yearbury, and Delta Insurance Company, Ltd.

*O'Connor, Green, Thomas, Walters & Kelly, Kenneth W. Green,* and *Frank J. Walz,* for Harold L. Burke, Pioneer Casualty Company, and Pioneer General Agency, Inc.

*Goff & Goff, Sydney W. Goff,* and *Richard D. Goff,* for Nevada State Bank.

*Van Valkenburg, Moss & Flaherty, Ltd.,* and *Paul Van Valkenburg,* for Bank of Nevada.

*Feidt, Lang & Pauly, Robert I. Lang,* and *Robert L. Smith,* for Fidelity and Deposit Company of Maryland.

*Briggs & Morgan, Samuel L. Hanson, Richard E. Kyle,* and *Frank Hammond,* for The First National Bank of St. Paul.

*Dorsey, Marquart, Windhorst, West & Halladay, James B. Vessey,* and *William B. Payne,* for Murphy Finance Company.

Heard before Knutson, C. J., and Otis, Rogosheske, Sheran, and Peterson, JJ.

PETERSON, JUSTICE.

The central issue in this case is whether Minnesota can assert jurisdiction over numerous nonresident defendants in actions arising out of an alleged conspiracy to convert assets of an insurance company, most of whose policyholders are residents of Minnesota. Twenty of the original defendants are nonresident corporations and individuals; three of the defendants are residents of this state. Twelve defendants, either as defendants or as third- and fourth-party plaintiffs, are involved in these appeals from various orders granting and denying motions to dismiss the actions. The result of our decision is to permit the exercise of jurisdiction by the state over all defendants named in the appeals.

The legal questions have been raised in the context of pretrial motions to dismiss, pursuant to Rule 12.02, Rules of Civil Procedure. Some of these motions were granted and some were denied, in each case primarily upon jurisdictional grounds. It is clear that in reviewing the granting of motions founded upon Rule 12(b), Federal Rules of Civil Procedure, the model for our Rule 12.02, allegations in the complaint must be taken as true. Radovich v. National Football League, 352 U. S. 445, 77 S. Ct. 390, 1 L. ed. (2d) 456; Guessefeldt v. McGrath, 342 U. S. 308, 72 S. Ct. 338, 96 L. ed. 342; Collins v. Hardyman, 341 U. S. 651, 71 S. Ct. 937, 95 L. ed. 1253; 1A Barron & Holtzoff, Federal Practice and Procedure (Rules ed.) § 350. The same standard of review must apply when reviewing denials of motions to dismiss; for if a standard more favorable to movants were

established, a type of forum shopping would be encouraged in that a defendant who lost on his pretrial motion would be heartened to know that the appellate court, with the same allegations and facts before it, would demand more of the plaintiff to keep the action alive. We therefore rely on the plaintiffs' complaints and the evidence adduced at the hearings upon the various motions for a statement of the facts:[1]

North Central Fire and Casualty Company is an insurance corporation organized under the laws of West Virginia, but it had its executive offices and transacted most of its business in Minnesota. Prior to March 24, 1966, a critical date in these proceedings, Cyril C. Sheehan, a Minnesota resident, was North Central's president and principal stockholder. Sheehan personally owed, directly and as guarantor, $295,857.84 plus interest to First National Bank of St. Paul, a national banking organization in Minnesota, and $206,049.60 to Murphy Finance Co., a Minnesota business corporation.

Sheehan was also a primary stockholder, along with Harold L. Burke, a resident of Texas, in Pioneer General Agency, Inc., and Pioneer Casualty Company, both Texas corporations. The plaintiffs claim that Sheehan sold his interests in North Central and (along with Burke) the two Pioneer companies to Block Management Services, Inc., and Financial Funding Corporation of Nevada, Inc., respectively, allegedly the corporate arms of Donald R. Roberts, a resident of Kansas City, Missouri. Financial Funding borrowed the $645,000 purchase price from two Las Vegas banks, Bank of Nevada and Nevada State Bank. The assets of North Central, $750,000 in the form of certificates of deposit held by First National Bank, were pledged as security for the loan. This amount represented the primary reserves for North Central's insureds.

The sale of North Central and the two Pioneer companies was consummated in St. Paul on March 24, 1966, at which time First

---

[1] This introductory statement of facts is amplified in Part IV.

National cashed and redeemed the certificates of deposit, prior to their maturity, and transferred the cash to the two Las Vegas banks, through the correspondent Security First National Bank of Los Angeles, which in turn simultaneously transferred $645,000 to First National. The latter amount allegedly was distributed in St. Paul as follows:

| | |
|---|---|
| First National Bank of St. Paul | $301,110.05 |
| Murphy Finance Co. | 206,049.60 |
| Harold L. Burke | 24,000.00 |
| Cyril C. Sheehan | 80,340.35 |
| (Various individuals not relevant to the appeals) | 33,500.00 |
| Total | $645,000.00 |

The $750,000 wire-transferred to Las Vegas was subject to immediate seizure by the two banks under pledge agreements. They exercised this right on April 29, 1966, and retained all but $92,062.50, as payoff of the loan and for loan and escrow fees. The $92,062.50 was sent to a group of individuals, known, for reasons hereinafter stated, as the "Roberts group."

Julian M. Riley and Edward M. Yearbury, residents of Kansas City, Missouri, were Roberts' attorney and accountant, respectively, and after the March 24 purchases were elected officers of North Central. Besides being a substantial stockholder in the Pioneer companies, Harold Burke, a resident of San Antonio, Texas, was the president of Pioneer Casualty. The names of all these parties appeared on the documents which were executed in St. Paul on March 24, 1966, though it is unclear whether all the individual defendants were at that meeting.

Delta Insurance Company, Limited, is a British Commonwealth corporation with offices in the Bahamas and Kansas City, Missouri. Plaintiffs allege that Delta was the intended foreign recipient of the funds.

Joe Haveson, deputy commissioner of insurance for the State of Minnesota, moved in Ramsey County District Court to freeze the assets of North Central and on April 29, 1966, such order was issued by Judge Albin S. Pearson. Thereafter, on June 17, 1966, Judge Harold W. Schultz of the Ramsey County District Court ordered Haveson to begin duties as conservator of North Central's assets. Haveson was replaced by L. Edwin Wang and he in turn by Thomas C. Hunt, the present plaintiff.

Meanwhile, on May 19, 1966, Frank R. Montgomery, insurance commissioner for West Virginia, petitioned the Circuit Court of Cabell County, West Virginia, for an order to take possession of the property and to liquidate the business and affairs of North Central. This request was granted on June 15, 1966.

The present action was commenced on March 12, 1968, by the Minnesota commissioner of insurance.[2] Essentially, the complaint alleges that the above-identified parties, for their own interest, conspired to deprive the creditors and policyholders of North Central of a fund upon which they had a right to rely, and asks that the defendants be held liable jointly and severally for $750,000 "or at least should be required to disgorge the amounts * * * each received." More particularly, it is claimed:

(1) The transfer of $750,000 in assets was without consideration and void if opposed by a shareholder or creditor of North Central, therefore subject to avoidance by the plaintiff.

(2) The seizure of the $750,000 in assets pursuant to the security agreement was unlawful for the same reason and must be returned.

---

[2] On February 26, 1968, Montgomery, the West Virginia commissioner, signed a "consent and authorization" giving plaintiff Hunt permission to begin suit in Minnesota. On March 29, 1968, Montgomery executed a specific consent to the prosecution of this litigation. On June 19, he filed for joinder as an additional plaintiff, and on August 12, 1968, Judge Arthur A. Stewart ordered his joinder.

(3) The premature payment of the certificates of deposit was contrary to Federal Reserve Regulations and caused a loss of $750,000 of North Central's assets, for which defendants are liable for damages.

(4) The defendants breached a fiduciary duty to the policyholders, entitling the plaintiff to a declaration that the $750,000 is held in trust.

(5) The defendants fraudulently converted the $750,000 and are liable for the loss.

(6) The defendants engaged in a conspiracy to defraud North Central, for which they are liable.

Commissioner Hunt additionally commenced an action against Fidelity and Deposit Company of Maryland for payment on a $100,000 employees' fidelity bond issued by Fidelity to North Central on March 1, 1965. Soon thereafter, Fidelity began third-party actions against all the original defendants. First National likewise moved to serve third- and fourth-party complaints against various other defendants.

Defendants involved in these appeals moved in due course to dismiss the several actions. All of these motions asserted lack of jurisdiction over the nonresident defendants; but some additionally asserted a failure of the complaints to state a claim upon which relief can be granted, and one asserted a failure by plaintiffs to join a Texas receiver as an indispensable party. On September 4, 1968, Judge Arthur A. Stewart ordered that the service of summons on several of these defendants be vacated. In November 1968, Murphy Finance moved for leave to file third- and fourth-party complaints, and on January 14, 1969, Judge Stewart granted the motion only as to those parties already made defendants in the action brought by First National. By order dated February 4, 1969, motions to dismiss First National's action, made by Roberts and Yearbury, were denied. The

result of the September, January, and February orders is set forth in the footnote below.[3]

The appeals from these orders can be categorized:

1. Plaintiffs appeal from that part of the order of Judge Stewart dismissing several defendants in the main action.[4]

2. Murphy Finance appeals the denial of leave to serve the Pioneer companies, Delta, and Harold L. Burke.[5]

3. Roberts and Yearbury appeal the denial of their motions to dismiss First National's action against them.[6]

4. The Nevada banks appeal the order subjecting them to suit in the main action[7] and in the action begun by Fidelity and Deposit.[8]

[3]

| | Main Action | Fidelity Action | First National Action | Murphy Action |
|---|---|---|---|---|
| First National | Served | Served | | |
| Murphy Finance | Served | Served | | |
| Nevada State Bank | Served | Served | Served | Served |
| Bank of Nevada | Served | Served | Served | Served |
| Don F. Roberts | Dismissed | Dismissed | Served | Served |
| Edward M. Yearbury | Dismissed | Dismissed | Served | Served |
| Harold L. Burke | Dismissed | Dismissed | | Denied |
| Julian M. Riley | Dismissed | Dismissed | Served | Served |
| Pioneer Casualty | Dismissed | Dismissed | | Denied |
| Pioneer General | Dismissed | Dismissed | | Denied |
| Delta | Dismissed | Dismissed | Denied | Denied |
| Fidelity and Deposit | Served | | | |

Note: Only those parties who have asserted rights on appeal in at least one of the actions are shown. "Served" means the trial court sustained jurisdiction. "Denied" means leave to serve third- or fourth-party complaints was denied. If no motion for impleader was made, the box is blank.

[4] Appeals No. 41697 and No. 41698.

[5] Nos. 41884 and 41885.

[6] Nos. 41856 and 41857.

[7] Nos. 41699 and 41700.

[8] Nos. 41702 and 41703.

5. Fidelity and Deposit appeals from that part of the order of September 4, 1968, dismissing several defendants in its action.[9]

Upon review we hold as follows: Denials of motions to dismiss are affirmed, as are the orders granting leave to file third- and fourth-party complaints. Orders granting motions to dismiss are reversed, as are orders denying leave to file third- and fourth-party complaints.

## I.

The preliminary question is the appealability of certain orders. Although the right of a plaintiff to appeal the granting of a motion to dismiss is unquestioned,[10] whether a party can appeal from denial of such a motion is a question deserving answer. We have generally held that the denial of a motion to dismiss for lack of jurisdiction—which appears to be the only way the lower court viewed the motions—requires a different rule of review than does the granting of such a motion for other reasons.[11] In Dieseth v. Calder Mfg. Co. 275 Minn. 365, 368, 147 N. W. (2d) 100, 102, we said:

"While the rule we follow with respect to the appealability of an order quashing service of a summons may be the minority view [see, Annotation, 30 A. L. R. (2d) 287], it has been the rule of this court since Plano Mfg. Co. v. Kaufert, 86 Minn. 13, 89 N. W. 1124, that an order *denying* a motion to quash service of summons is appealable."

---

[9] No. 41701.

[10] Rule 103.03, Rules of Civil Appellate Procedure, provides in part: "An appeal may be taken to the Supreme Court:

* * * * *

"(f) From an order which, in effect, determines the action, and prevents a judgment from which an appeal might be taken."

[11] See, Note, *Appealable Orders, Prohibition, and Mandamus in Minnesota*, 51 Minn. L. Rev. 115.

It is more realistic to view such an order not merely as a retention of an action for trial, but as a determination of right, for a defendant is compelled thereby to take up the burden of litigation in this state that might otherwise be avoided.

Murphy has argued that the denial of leave to serve third- and fourth-party complaints is appealable of right. The argument is without merit. See, Chapman v. Dorsey, 230 Minn. 279, 41 N. W. (2d) 438, 16 A. L. R. (2d) 1015, and Luethi v. Stanko, 240 Minn. 380, 61 N. W. (2d) 522. However, Murphy has additionally petitioned for discretionary review. Because we should attempt whenever possible to avoid unnecessary cost to the parties, and because the decision on Murphy's motions must be based on considerations inextricably interwoven with the factors influencing our conclusion regarding the defendants in the main action, we reach the merits of its appeal under the provision allowing for discretionary review.[12]

Nevada State Bank contends that it was error for the trial court implicitly to deny its motion to dismiss for failure to state a claim upon which relief can be granted. Denial of such an order is not appealable of right where the trial judge has not certified its importance.[13]

Both Nevada banks have vigorously urged, both below and upon appeal, that the actions against them must be dismissed because the plaintiffs have failed to join, as an indispensable party, an ancillary receiver appointed in the State of Texas. More is involved in this motion than a third-party action, brought pursuant to Rule 14, Rules of Civil Procedure, to avoid a multi-

---

[12] Rule 105.01, Rules of Civil Appellate Procedure, states in part: "The Supreme Court, in the interest of justice and upon the petition of a party, may allow an appeal from an order not otherwise appealable under Rule 103.03 except an order made during trial."

[13] Rule 103.03(i), Rules of Civil Appellate Procedure. Even considered on the merits under our powers of discretionary review, however, and taking the plaintiff's allegations as true, a viable cause of action is clearly stated.

plicity of actions, the situation in Chapman v. Dorsey, *supra*, and Luethi v. Stanko, *supra*. What is involved is the provision of Rule 19, Rules of Civil Procedure,[14] which is designed to protect a defendant from multiple liability. If, as these defendants claim, the Texas receiver will not be foreclosed from suing them after termination of the present action, a failure to join him would result in irremediable damage, raising serious constitutional problems of due process. See, Western Union Telegraph Co. v. Pennsylvania, 368 U. S. 71, 82 S. Ct. 199, 7 L. ed. (2d) 139.

The considerations in weighing a motion based upon failure to join an indispensable party are quite similar to those presented by a motion to dismiss for lack of jurisdiction. The concept of indispensable parties, like that of jurisdiction—

"* * * is a means of recognizing the importance of foreign relationships which ought not be disrupted by the application of local judicial power over parties who may be disabled from meeting obligations to others not subject to the court's power, or who may be subjected to overlapping and conflicting claims or obligations." Carrington and Martin, *Substantive Interests and the Jurisdiction of State Courts,* 66 Mich. L. Rev. 227, 235.

See, generally, Fink, *Indispensable Parties and the Proposed Amendment to Federal Rule 19,* 74 Yale L. J. 403. Logical analogies can also be made to a motion to intervene of right, denial of which has been held to be appealable. Thibault v. Bostrom, 270 Minn. 511, 134 N. W. (2d) 308.

The basis for disposition of the indispensable-party motions

---

[14] Rule 19.01 provides in part: "A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

of the two Nevada banks is not detailed in the trial court's orders. Because no mention of Rule 19 was made, we have assumed that the motions were denied. We hold, in any event, as a procedural matter, that the two banks have an appeal of right from an order denying such motions, and Hunt's motion to dismiss these portions of the appeal is denied.[15]

## II.

The most crucial issue in this case is whether Minnesota's "nonconsensual" long-arm statute, Minn. St. 543.19,[16] may be applied retroactively as an effective means of obtaining personal jurisdiction over the nonresident defendants. The statute was enacted subsequent to the time of the alleged wrongful acts giving rise to the present action. The trial court held that the statute had no retroactive application.

---

[15] Our disposition of these appeals, as a substantive matter, is considered in Part VIII.

[16] Minn. St. 543.19 provides: "Subdivision 1. As to a cause of action arising from any acts enumerated in this subdivision, a court of this state with jurisdiction of the subject matter may exercise personal jurisdiction over any foreign corporation or any non-resident individual, or his personal representative, in the same manner as if it were a domestic corporation or he were a resident of this state. This section applies if, in person or through an agent, the foreign corporation or non-resident individual:

"(a) Owns, uses, or possesses any real or personal property situated in this state, or

"(b) Transacts any business within the state, or

"(c) Commits any tort in Minnesota causing injury or property damage, or

"(d) Commits any tort outside of Minnesota causing injury or property damage within Minnesota, if, (1) at the time of the injury, solicitation or service activities were carried on within Minnesota by or on behalf of the defendant, or (2) products, materials or things processed, serviced or manufactured by the defendant were used or consumed within Minnesota in the ordinary course of trade.

"Subd. 2. The service of process on any person who is subject to the jurisdiction of the courts of this state, as provided in this section, may be made by personally serving the summons upon the defendant out-

The nonresident defendants have presented strong arguments against retroactive application. One of our statutory canons of construction, § 645.21, provides:

"No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."

And it is obvious that § 543.19 is silent as to the extent of its application. The nonresident defendants forcefully contend that to allow after-enactment service under § 543.19 would be a complete reversal of our longstanding case law. Even though language in the following cases cited by defendants made no such distinction, it is demonstrable that, with one exception, the cases distinguishably involved either the construction of a "consensual" long-arm statute or a situation in which the retroactive application of a statute would substantially affect the outcome of the action on the merits:

*a.* Chapman v. Davis, 233 Minn. 62, 45 N. W. (2d) 822. On July 18, 1943, the plaintiff was injured by the defendant's negligent manipulation of a wheel jack while changing tires. An action was commenced in 1949, the same year an amendment to a provision of the Safety Responsibility Act enlarged the jurisdictional reach of the Minnesota courts by allowing a plaintiff to serve the commissioner of highways as the attorney of both

---

side this state with the same effect as though the summons had been personally served within this state.

"Subd. 3. Only causes of action arising from acts enumerated in subdivision 1 may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

"Subd. 4. Nothing contained in this section shall limit or affect the right to serve any process in any other manner now or hereafter provided by law or the Minnesota Rules of Civil Procedure.

"Subd. 5. Non-resident individual, as used in this section, means any individual, or his personal representative, who is not domiciled or residing in the state when suit is commenced."

(It has been assumed throughout the proceedings that if this statute is available, it will be applied through subd. 1[c].)

nonresident *and* resident drivers. The defendant was a Minnesotan at the time of the injury but had since moved out of the state. Minn. St. 1949, § 170.55, under which plaintiff was claiming jurisdiction, provided that the use of a motor vehicle within Minnesota "shall be deemed an appointment * * * of the commissioner of highways to be [the driver's] * * * attorney" upon whom service could be made, and that such use would constitute a "signification of * * * agreement" that such service would be legally effective. The statute may thus be classified a "consensual" long-arm statute.

We do not ignore the flat pronouncement of the court (233 Minn. 65, 45 N. W. [2d] 824) that § 645.21, as a canon of construction, is "expressive of the principle that the courts will presume that a statutory enactment applies to the future and not to the past * * * without making any distinction between laws relating to procedure and those pertaining to substantive rights." It will be noted, however, that the statute was an amendment to an existing statute, so that decision was based also upon § 645.31, a canon of construction providing that an amendment merges into the prior law but shall be effective only from the time the amendment is passed. Statutory canons of construction or presumptions of legislative intent, as we note later, must be considered along with other canons of construction and indicia of legislative intent.

Chapman cited Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535, as authority for its sweeping pronouncement against retroactive application of statutes effecting either procedure or substantive rights. In that case a deceased fireman's wife filed a claim for workmen's compensation benefits on October 25, 1943. The alleged cause of death was employment-caused myocarditis. A 1941 statute created a presumption that if people in certain employment, including fire fighting, contract certain diseases, including myocarditis, the disease is employment-related. A 1943 statute effective before the filing of the claim, but after the fireman's death, repealed this presumption

(which the court labeled "procedural") and, in addition, changed several substantive rules of law regarding disability, which it is unnecessary to discuss. In determining which statute applied, the court said (219 Minn. 562, 18 N. W. [2d] 539):

"* * * There is nothing in the 1943 statute showing that it should *not* operate prospectively as to matters of procedure and evidence. Such matters do not affect rights accrued. * * * The result is that matters of procedure and evidence are governed by the law in force when the right to compensation is *asserted*. [Citing cases.] As applied here, the result of such construction is that the *substantive* rights of the parties are controlled by the 1941 statute. * * * The procedural and evidentiary provisions governing the assertion of that right [to compensation] are those contained in the *1943* statute." (Italics supplied.)

It is to be noted that § 645.21 was in effect when Ogren was decided. It is clear that the court nevertheless applied the procedural aspects of the 1943 statute retroactively. What Chapman must be taken to mean, then, is that procedural statutes based upon consent and statutes affecting substantive rights will not be applied retroactively.

*b.* Ekstrom v. Harmon, 256 Minn. 166, 167, 98 N. W. (2d) 241, 242. The plaintiff was struck by a car 3 days before the effective date of a law establishing a presumption that the deceased was acting with due care. The language of Chapman v. Davis, *supra*, permitted a facile resolution of the case:

"* * * It is unnecessary for us to determine whether the presumption established by § 602.04 involves a law of procedure or a substantive law since this court in Chapman v. Davis, 233 Minn. 62, 65, 45 N. W. (2d) 822, 824, after quoting the presumption against retroactive application of statutes in § 645.21, held:

" '* * * § 645.21 applies to all laws without making any distinction between laws relating to procedure and those pertaining to substantive rights.'

"This case has since been followed at least twice."[17]

*c.* Marsolek v. Miller Waste Mills, 244 Minn. 55, 69 N. W. (2d) 617. The issue was whether a 1947 amendment to the statute controlling the manner in which workmen's compensation payments were to be made should be applied to an injury occurring in 1944. The amendment so changed the wording of the provisions that, as a substantive matter, the injured party would recover more than he would have under the law existing in 1944, a result the court held would violate the rule of Chapman v. Davis, *supra.*

*d.* Majerus v. Walk (D. Minn.) 275 F. Supp. 952. The plaintiff's mother purchased some sausage from a store in Iowa and brought it to her daughter's home in Austin, Minnesota. The daughter became ill after eating it and sued the Iowa merchant in the Minnesota Federal court, using § 543.19 to gain jurisdiction. The cause of action accrued on February 18, 1966, the law became effective on May 16, 1967, and service was made on August 25, 1967. The court quoted § 645.21, adding (275 F. Supp. 954):

"* * * A well-established line of Minnesota decisions holds, in closely analogous situations, that a procedural statute permitting service upon individuals beyond the state is not to be applied retroactively to causes of action accruing prior to its promulgation. [Citing Hinton v. Peter, 238 Minn. 48, 55 N. W. (2d) 442; Hughes v. Lucker, 233 Minn. 207, 46 N. W. (2d) 497; Chapman v. Davis, *supra.*] Other Minnesota decisions have refused to permit retroactive application of other procedural statutes. [Citing Ekstrom v. Harmon, *supra*; Marsolek v. Miller Waste Mills, *supra.*]"

---

[17] Hughes v. Lucker, 233 Minn. 207, 46 N. W. (2d) 497; Marsolek v. Miller Waste Mills, 244 Minn. 55, 69 N. W. (2d) 617. See, Guerra De Chapa v. Allen (S. D. Tex.) 119 F. Supp. 129, 133.

Hughes v. Lucker, *supra*, involved the application of Minn. St. 170.55, as did Hinton v. Peter, 238 Minn. 48, 55 N. W. (2d) 442, another case cited by the respondents.

The result in Majerus does support defendants' position. Majerus is not independent authority for that position, however, in the sense that it simply undertook to apply the Federal court's interpretation of the state's case law.

We think the most basic interest of our legislature in enacting § 543.19 was to afford maximum protection to this state's residents injured by acts of nonresidents; that is, to extend the extraterritorial jurisdiction of our courts to the maximum limits consistent with constitutional limitations. Regardless of statutory canons of construction, the legislature could not have intended retroactively to alter substantive rights, such as changes in a plaintiff's measure of recovery. It would, at the same time, require too great a mental feat to conceive of retroactive appointment of an agent, the fiction upon which earlier consensual long-arm statutes were based.[18] The retroactive application of § 543.19, simply a procedural permission to sue, does not rely upon consent and does not alter any substantive right of a nonresident defendant.

Our emphasis on alteration of substantive rights and retroactive consent is not novel. The important case of Nelson v. Miller, 11 Ill. (2d) 378, 382, 143 N. E. (2d) 673, 676, involving the long-arm statute upon which Minn. St. 543.19 is modeled, articulated this first distinction:

"* * * The law applicable in the State of Illinois is that there is no vested right in any particular remedy or method of procedure, and that, while generally statutes will not be construed to give them a retroactive operation unless it clearly appears that such was the legislative intent [in effect what Minn. St. 645.21 says], nevertheless, when a change of law merely affects the remedy or law of procedure, all rights of action will be enforceable under the new procedure without regard to whether they accrued before or after such a change of law and without regard

---

[18] The same distinguishing principle would apply to Minn. St. 303.13, subsequently considered in this opinion.

to whether the suit has been instituted or not, unless there is a saving clause as to existing litigation."[19]

The second distinction has been recently summarized in Annotation, 19 A. L. R. (3d) 138, 141:

"* * * [A] distinction has been made between statutes which provide by their terms merely that the acts or transactions specified therein shall be the basis of the jurisdiction of local courts over * * * nonresidents or foreign corporations, and statutes, often called 'implied consent' statutes, which by their terms provide that such acts or transactions are deemed to be the consent of the nonresident or foreign corporation to the appointment of a local officer as agent for the purpose of service of process. The general rule that, in the absence of a statutory provision to the contrary, statutes pertaining to procedure operate retrospectively, has been applied to long-arm statutes of the first kind. Under this view the retroactive application of such a statute is not precluded by the fact that the act or transaction upon which jurisdiction is predicated occurred prior to the effective date of the statute. On the other hand, 'implied consent' statutes have generally been held not to operate retroactively * * *. This rule rests on the view that neither as a matter of statutory construc-

---

[19] Third- and fourth-party plaintiff First National and plaintiff Hunt argue that the use of § 543.19 in this case is actually not a retroactive application. Support of this statement is found in 50 Am. Jur., Statutes, § 476: "A retrospective law, in the legal sense, is one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation or imposes a new duty, or attaches a new disability, in respect of transactions or considerations already past." See, also, Cox v. Hart, 260 U. S. 427, 43 S. Ct. 154, 67 L. ed. 332; Chovan v. E. I. DuPont DeNemours & Co. (E. D. Mich.) 217 F. Supp. 808; Hoen v. District Court, 159 Colo. 451, 412 P. (2d) 428, 19 A. L. R. (3d) 131. However, the rationale for the conclusion that it is not a retrospective application when a procedural law is relied upon in a suit where the cause of action accrued before the law's effective date is the same as that which distinguishes the cases involving procedural issues from those involving substantive rights.

tion nor as a matter of constitutional law is it possible to imply consent retroactively."

The origin of Minn. St. 543.19 in a comparable Illinois statute invokes yet another canon of construction, for § 645.22 provides:

"Laws uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."[20]

The Illinois statute upon which § 543.19 is modeled was applied retrospectively in Nelson v. Miller, *supra,* and this decision has been followed by the majority of courts faced with the question of retroactive application of an Illinois-type long-arm statute. Teague v. Damascus (E. D. Wash.) 183 F. Supp. 446, is an example. The defendants had committed a tort on August 17, 1958. The long-arm statute became effective June 11, 1959. The general rule in Washington, similar to that in Minnesota, was that statutes are to be construed as prospective unless there is clear legislative directive to the contrary. The court followed the Illinois approach because the statute brought its own interpretation (183 F. Supp. 448):

"The statute in question we find was adopted from and copies an earlier Illinois statute. The Supreme Court of the State of Washington is committed to the proposition that a statute adopted from another state or country is presumed to have been taken with the construction there placed upon it."

See, also, Clews v. Stiles (10 Cir.) 303 F. (2d) 290 (where the Court of Appeals assumed that the New Mexico Supreme Court would adopt the Illinois interpretation because New Mexico had adopted the Illinois statute); Hoen v. District Court, 159 Colo. 451, 412 P. (2d) 428, 19 A. L. R. (3d) 131; Woodring v. Hall, 200 Kan. 597, 438 P. (2d) 135.

---

[20] See, also, Congdon v. Congdon, 160 Minn. 343, 200 N. W. 76; Nicollet Nat. Bank v. City Bank, 38 Minn. 85, 35 N. W. 577; 50 Am. Jur., Statutes, § 458.

Chovan v. E. I. DuPont DeNemours & Co. (E. D. Mich.) 217 F. Supp. 808, has been a helpful opinion because the arguments and statutory context were quite similar to those in the present situation. The action was for wrongful death. Samuel Chovan, a miner, was killed on October 1958 when allegedly defective blasting caps and fuse lighters manufactured by defendants caused a premature dynamite explosion. The Michigan Revised Judicature Act became effective January 1, 1963, and service was made January 2, 1963. The relevant portion of the new law provides (Mich. Stat. Ann. § 27A.715) :

"The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:

\* \* \* \* \*

"(2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort."

Another section of the act[21] states that unless clearly provided, § 27A.715 must not "affect" any past act. But the court allowed use of the new long-arm law, distinguishing, as we have, the cases dealing with substantive rights ("The rule which forbids application of new enactments or revisions to pending actions generally applies only to statutes dealing with substantive rights." 217 F. Supp. 810) and those dealing with consensual long-arm statutes ("This fictional agency relationship provided

---

[21] Mich. Stat. Ann. § 27A.9905 provides in part: "Except as specifically stated or reasonably inferred from the provisions of this act, this act shall not impair or affect any act done, offense committed or right accruing, accrued, or acquired, or liability, penalty, forfeiture or punishment incurred prior to the time this act takes effect, but the same may be enjoyed, asserted, enforced, prosecuted, or inflicted as if this act had not been passed."

the basis for the state's jurisdiction over the non-resident. Accordingly, if the effective date of such a statute was subsequent to the motorist's entry, the statute was held not to have created a prior agency relationship which in fact did not exist." 217 F. Supp. 811).[22]

It is constitutionally permissible to apply § 543.19 as we do today. In McGee v. International Life Ins. Co. 355 U. S. 220, 224, 78 S. Ct. 199, 201, 2 L. ed. (2d) 223, 226, the alleged contacts with the California plaintiff occurred before the California jurisdictional statute became law, and, while the case involved a contract and not tort, the court's reasoning is relevant:

"* * * Respondent contends that application of the statute to this existing contract improperly impairs the obligation of the contract. We believe that contention is devoid of merit. The statute was remedial, in the purest sense of that term, and neither enlarged nor impaired respondent's substantive rights or obligations under the contract. It did nothing more than to provide petitioner with a California forum to enforce whatever substantive rights she might have against respondent. At the same time respondent was given a reasonable time to appear and defend on the merits after being notified of the suit. Under such circumstances it had no vested right not to be sued in California."

The first constitutional test of the Illinois-model nonconsensual long-arm statute came in Nelson v. Miller, 11 Ill. (2d) 378, 382, 143 N. E. (2d) 673, 675, where the court said:

"We consider first the defendant's contention that the new provisions of the statute cannot be applied to him because the cause of action arose before the effective date of the provisions authorizing extraterritorial service on nonresident defendants. Insofar as this claim is based on the Federal constitution it is without merit. Sections 16 and 17 do 'not extend either to

---

[22] Other cases dealing with retrospective application of long-arm statutes are collected in 19 A. L. R. (3d) 138 and 2 Moore, Federal Practice (2 ed.) par. 4.41-1[3], p. 1291.56, n. 23.

destruction of an existing cause of action or to creation of a new liability for past events.' Cohen v. Beneficial Industrial Loan Corp. 337 U. S. 541, 554 (1949); see also Ex parte Collett, 337 U. S. 55, 71 (1949); *cf.* Federal Rules of Civil Procedure, Rule 86.

\* \* \* \* \*

"\* \* \* Retrospective application of such a statute creates a problem only if that application operates unfairly against a litigant who justifiably acted in reliance on some provision of the prior law."

Retroactive exercise of jurisdiction based upon tortious injury is highly unlikely to frustrate expectations. With a conspiracy, as is here alleged, there may be actual reliance, but it is not one this court should protect. Certainly it is not enough to approach constitutional dimensions. While McGee did not foreclose the constitutional issues presented by jurisdictional retroactivity, the Supreme Court's summary analysis of the problem makes it clear that a constitutional objection will not be sustained absent an extreme factual situation. See, Note, *Retroactive Expansion of State Court Jurisdiction Over Persons*, 63 Col. L. Rev. 1105, 1124; Restatement, Conflict of Laws (2d) Proposed Official Draft, § 36, *comment e.*

We hold, therefore, that § 543.19 is retroactive in its application. The effect of this holding is to validate service upon the individual defendants. It also validates service on Delta under Minn. St. 543.19.[23] It is unnecessary to decide when Fidelity's cause of action arose, itself a vigorously disputed point of law; treating it for present purposes as arising at the same time as Hunt's, Fidelity's service under § 543.19 is sufficient to subject the defendants to suit in its third-party action.[24] In addition,

[23] The appeals on which Delta and Hunt argued this point are Nos. 41697 and 41698.

[24] The adequacy of Fidelity's service was an issue in the appeals of the third-party action against Nevada State Bank (No. 41702) and Bank of Nevada (No. 41703), and in Fidelity's appeal relating to dismissal of

this holding disposes of the issues raised in the appeals from the refusal to dismiss the third- and fourth-party actions brought by First National against Roberts and Yearbury,[25] and answers a major question in Murphy's appeals from denial of leave to serve Delta, Burke, and the Pioneer companies.[26]

Finally, our conclusion renders moot the question of the validity of Hunt's service, pursuant to Rule 14, Rules of Civil Procedure, of those defendants (Roberts and Yearbury) he was unable to serve in the main action but was allowed to serve in a third-party action because the defendants had been successfully served by First National.[27]

### III.

Not all the defendants were served under Minn. St. 543.19. The two Pioneer companies were served by Hunt under § 303.13, and Pioneer Casualty was also served under § 60A.21. Although the trial court did consider the applicability of these statutes, it dismissed the actions against these two companies on the ground that there was no showing of a contract made with a Minnesota resident or a tort committed in Minnesota. Before discussing in Part IV the issue posed by the different statutory grounds stated, we should first consider the more specific application of §§ 303.13 and 60A.21 as a statutory vehicle to reach these two defendants. The first statute provides in part:

"Subdivision 1. A foreign corporation shall be subject to service of process, as follows:

\* \* \* \* \*

"(3) If a foreign corporation makes a contract with a resident of Minnesota to be performed in whole or in part by either

---

defendants Roberts, Riley, Yearbury, and Delta by the trial court's September 4 order (No. 41701).

[25] Nos. 41856 and 41857.

[26] Nos. 41884 and 41885.

[27] No. 41855. In an effort to avoid confusion, this appeal was not mentioned in the general discussion of the factual and procedural background of this case.

party in Minnesota, or if such foreign corporation commits a tort in whole or in part in Minnesota against a resident of Minnesota, such acts shall be deemed to be doing business in Minnesota by the foreign corporation and shall be deemed equivalent to the appointment by the foreign corporation of the secretary of the State of Minnesota * * * to be its true and lawful attorney * * *."

The word "corporation" is defined in § 303.02, subd. 4:

" 'Foreign corporation' does not include any corporation * * *, under the constitution and statutes of the United States, * * * [or] insurance companies as defined by Minnesota Statutes, Section 60.02 * * *."

Section 60.02, repealed and reenacted as § 60A.02, reads in part:

"Subd. 4. 'Company' or 'insurance company' includes every insurer, corporation, business trust, or association engaged in insurance as principal."

Pioneer General *Agency* is not an insurance company as defined by the statute, but Pioneer Casualty may be. As a safeguard, then, Hunt additionally served Pioneer Casualty under the second statute, § 60A.21, subd. 2, which provides in part:

"(1) Any of the following acts in this state effected by mail or otherwise by an unauthorized foreign or alien insurer: (a) the issuance or delivery of contracts of insurance to residents of this state or to corporations authorized to do business therein; (b) the solicitation of applications for such contracts; (c) the collection of premiums, membership fees, assessments, or other considerations for such contracts; or (d) any other transaction of insurance business, is equivalent to and shall constitute an appointment by such insurer of the commissioner of insurance and his successor or successors in office to be its true and lawful attorney upon whom may be served all lawful process in any action, suit, or proceeding instituted by or on behalf of an insured or

beneficiary *arising out of* any such contract of insurance * * *." (Italics supplied.)

We see no inconsistency in the use of § 303.13 against defendant Pioneer Casualty. It is obvious that this statute extends jurisdiction over the nonresident defendant for insurance-related happenings. Hunt has not seriously claimed that this defendant's insurance transactions in Minnesota were the cause of this suit. Rather, his allegations sound in tortious conversion, so that the character of the defendant's business, whether as insurer or otherwise, is quite unimportant for these purposes. Section 303.13 by its reference to the Insurance Code shows that the former was not intended to cover what § 60A.21 covers; and it can be inferred that if § 60A.21 doesn't apply (and it would not when the insurance company has contacts not related to insurance), then § 303.13 does. There was an intended harmonious mesh between these two jurisdictional statutes; the legislature cannot have meant to grant immunity to the corporation aiding in a tortious conversion in Minnesota merely because that organization is an insurance company.[28]

---

[28] Also served under § 303.13 were the two Nevada banks, which argued that because the statute by express reference authorizes its use for residents of Minnesota, North Central, being a West Virginia corporation, is excluded. That reference reflects the primary concern of the legislature for residents, but reflects no intention to use that term in its most technical sense. We agree with the conclusion of Judge Larson in United Barge Co. v. Logan Charter Service, Inc. (D. Minn.) 237 F. Supp. 624, where he held that Cargill Corporation, a Delaware corporation with a base in Minnesota, could use § 303.13 to reach a Louisiana defendant, based upon the fact that, notwithstanding its foreign incorporation, Cargill had its principal place of business in Minnesota and had extensive contacts within the state. He reasoned (237 F. Supp. 629): "* * * [T]he restriction of the right to sue to residents of the State can best be understood as an attempt to insure that the jurisdiction the State was attempting to exert would be valid within the due process clause. The Legislature was extending its protection only to those parties for whom the State had a considerable interest in providing a forum because of their continuous and established con-

## IV.

With respect to the ground upon which the trial court dismissed the actions against the Pioneer companies, we reach a different conclusion. The available facts are based upon documentary evidence rather than any resolution of testimonial conflict, as to which we would be required to defer to the trial court. We think the allegations of the complaint and the collateral evidence, taken as true, sufficiently establish a factual issue as to the role of the Pioneer companies, as corporate entities, in the alleged conspiracy. The security arrangement between North Central and the Nevada State Bank under which the former's assets were used as a "guarantee deposit" to effectuate the loan by the Nevada banks to Financial Funding is set forth in a "commitment agreement," signed March 24, 1966.[29] Paragraph 6 of that document states:

"Borrower will pledge to Nevada State as collateral security for the payment of the aforesaid promissory note, all of the issued and outstanding capital stock of Pioneer Casualty Company, Inc., a Texas corporation, and Pioneer General Agency, Inc., a Texas corporation, both of San Antonio, Texas."

Other documentary evidence would raise an inference that the role of the Pioneer companies was not merely passive, but active, involvement in a crucial early stage of the alleged scheme. In a letter dated March 21, 1966, from Cyril Sheehan and Harold L.

---

tacts with Minnesota. Thus viewed, the crucial test as to whether a foreign corporation should be classed as a resident for the purposes of the One Act Statute would appear to be a consideration of the extent of its contacts with the State."

In the instant case, moreover, the ultimate injury was to the creditors and policyholders of North Central, most of whom are admittedly Minnesotans and to whom the Minnesota Legislature would obviously not intend to deny protection of the statute.

[29] Julian Riley signed for North Central, as its president. Hunt maintains that since Riley is a member of the "Roberts group," his signature indicates that the "new management" was in control when this agreement was signed.

Burke to R. E. Fawcett, Jr., vice president of the Frost National Bank of San Antonio, Texas, Sheehan and Burke requested that certain stocks be sent to the First National Bank of St. Paul and thence to the Nevada State Bank, "for safekeeping by such bank in accordance with *a resolution* previously passed by Pioneer General Agency, Inc. and heretofore furnished to the Nevada State Bank, Las Vegas, Nevada, or its representatives." (Italics supplied.) This stock, according to the theory of Hunt's action, was to be used as a good-faith deposit, as "collateral security." Sheehan and Burke, in essence, were using their available assets in North Central and the Pioneer companies to secure the loan to Roberts.

Although Pioneer Casualty did not pass a resolution or take as clear-cut corporate action as Pioneer Agency did, when the officers and only owners of a corporation—closely held as this was—use their interests to negotiate an alleged fraudulent transaction involving the sale of that closely held corporation, it can be said that the owners, although acting in their individual interests, acted also for the corporation. Acts of managing officers or directors constitute "business of the corporation though unauthorized by its charter." Ballantine, Corporations (Rev. ed. 1946) § 111. This is so even if the officers practice ultra vires deceit, Myzel v. Fields (8 Cir.) 386 F. (2d) 718, 749; Brennan v. Midwestern United Life Ins. Co. (N. D. Ind.) 259 F. Supp. 673, 681; and even if the tortfeasor received no benefit therefrom, James-Dickinson Farm Mtge. Co. v. Harry, 273 U. S. 119, 123, 47 S. Ct. 308, 310, 71 L. ed. 569, 574; Myzel v. Fields, *supra.*

As an aid to understanding what Burke allegedly stood to gain by these complicated financial dealings, it is appropriate to recite some of the details of the purchase agreement between Sheehan and Burke as sellers and Financial Funding as buyers, dated March 24, 1966, and signed by Yearbury for Financial Funding. That document states that Sheehan owned 250 shares and Burke, 240 shares of Pioneer Agency stock. (And Pioneer Agency owned Pioneer Casualty.) Sheehan also owned a $50,000 face-value sur-

plus debenture issued by Pioneer Casualty. Sheehan's stock and debenture were sold for $375,000. Burke sold his stock for $24,000 and took an assignment of an $11,000 interest in the $50,000 surplus debenture, a sum equal to 10 percent of the underwriting profits of Pioneer Casualty for 5 years, and 1 percent of the net profits of Pioneer Casualty for 5 years. Financial Funding also agreed to pay off a $20,000 note owed by Pioneer Agency to the Harris family of San Antonio.

The trial court's dismissal of Delta was, as in the case of the Pioneer companies, based upon the absence of any showing of factual connection with the alleged conspiracy. The claims as to Delta's role in the conspiracy are hesitant, sometimes even self-contradictory. Justice nevertheless warrants an examination of the merits of the main, third-, and fourth-party actions against Delta on the basis of the prima facie case that has been constructed against it.

It is alleged that Delta, as another corporation controlled by Roberts, was the intended final recipient of the $750,000; and that Delta was represented in Minnesota by Roberts, Riley and/or Yearbury, none of whom has disputed his presence in St. Paul on March 24. If true, there would be a sufficient basis for the assertion of jurisdiction over Delta. The allegations as to Delta's role are not wholly without evidentiary support, although their legal significance is arguable. On April 23, 1966, Delta agreed to reinsure 90 percent of North Central's business, in return for $750,000 in certificates of deposit. North Central was to receive as a "ceding commission" a surplus premium note for $255,125, bearing interest at 5 percent per year and providing for principal payment at 2 1/2 percent of all premium income received by Delta. Delta actually assumed certain of North Central's obligations and appointed a Minnesota resident as agent to carry out the duties owed the insureds.[30] Delta will have

---

[30] When the Las Vegas banks learned of the reinsurance agreement, it may be noted, they exercised their security rights, as a result of which the final stage in the alleged plan broke down.

ample opportunity at trial to rebut the assumptions upon which jurisdiction is founded and, of course, the allegations which would establish liability.

The Las Vegas banks have argued with vigor that there is no indication whatever of their participation in any unlawful plan. Whether it was unlawful will have to await full trial, but there are sufficient facts from which to conclude that they were included in a plan. It is clear, as to Nevada State Bank, that on March 24, 1966, its vice president, W. W. Rogers, flew to St. Paul and executed on behalf of his bank several of the documents there circulated. It was not until March 25, 1966, however, that Bank of Nevada purchased $250,000 worth of the loan to Financial Funding. Although that part of the transaction occurred the day after the March 24 contact with Minnesota, it is unrealistic, at least at this point, to view such purchase as a business coincidence. It would be an improbable assumption that a participation in a quarter-of-a-million-dollar loan occurred with only two or three hours' deliberation and wholly without any information as to its background. The crediting and debiting of accounts at the Los Angeles correspondent bank on March 24 involved both Nevada State Bank and Bank of Nevada. The commitment agreement, likewise dated March 24, states that Time Certificates 5651 to 5675 "issued by Bank of Nevada" were delivered by North Central to Nevada State Bank as evidence of the former's good faith.

Two of the alleged conspirators evinced their own understanding that the Bank of Nevada was to be a participant with the Nevada State Bank. A letter from a vice president of Nevada State Bank, Calvin S. Smith, to former Minnesota Attorney General Robert Mattson, dated June 22, 1966, states:

"Our Senior Vice President, Mr. W. W. Rogers, Jr., visited St. Paul with instructions not to release the cashier's check of our bank and of the associated bank, Bank of Nevada, in the amount of $645,000.00, until he had actually in his possession $750,000.00 in a cashier's check."

And in a resolution of the North Central Board of Directors, dated March 24, 1966, it was agreed—

"* * * that the President, Julian M. Riley, of this corporation, and the Secretary, H. Carl Balsiger, of this corporation, be and they hereby are authorized and directed to deposit with Nevada State Bank and Bank of Nevada, both Nevada banking corporations, funds of the Corporation in the amount of $750,000.00, to purchase Certificates of Deposit in said banks."

It is undisputed that the great majority of defendants, both corporate and individual, were present at the important St. Paul meeting on March 24, either in person or by an agent. Our statute, however, does not require a finding that each defendant be physically present in this state at the time the conspiracy has its fruition. Once participation in a tortious conspiracy—the effect of which is felt in this state—is sufficiently established, actual physical presence of each of the alleged conspirators is not essential to a valid assertion of jurisdiction. This construction of our statute follows from the premise that the legislature intended the statute to reach as far as constitutional limitations would permit.

## V.

We must consider, then, whether such application of our statutes conforms to the due-process limitations of the Fourteenth Amendment. In the familiar case of International Shoe Co. v. Washington, 326 U. S. 310, 316, 66 S. Ct. 154, 158, 90 L. ed. 95, 102, the Supreme Court said:

"* * * [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

Subsequent cases, especially McGee v. International Life Ins. Co. 355 U. S. 220, 78 S. Ct. 199, 2 L. ed. (2d) 223, and Hanson v.

Denckla, 357 U. S. 235, 78 S. Ct. 1228, 2 L. ed. (2d) 1283, have indicated that there are no mechanical or quantitative constitutional limits on the exercise of jurisdiction, that what is "fair" will vary with each case. The extent of the contacts minimally required for constitutional due process has been the subject of considerable legal literature. Professor David Currie has written:

"* * * Probably the most that can be said in a general way is that due process embodies a test of fundamental fairness in all steps of the proceedings; that our sense of fairness is outraged by certain assertions of jurisdiction on the part of States unconnected with the parties or with the controversy; and that this sense of unfairness stems partly from the inconvenience and expense involved, partly from the idea of unfair surprise, partly from anticipation of an improper choice of law, and partly from more general notions of the limits of a state's rightful sovereignty." Currie, *The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois,* 1963 U. of Ill. L. Forum, 533, 535.

At least two writers go beyond this flexibility concept by categorizing requisite minimal contacts according to a hierarchy of interests which a long-arm statute may properly protect. Carrington and Martin, *Substantive Interests and the Jurisdiction of State Courts,* 66 Mich. L. Rev. 227. They suggest, for example, that assertion of long-arm jurisdiction in a libel case may require a stronger showing than in other types of actions.[31] Unlike the additional First Amendment considerations in such a hierarchy of values, the present tort action is plainly subject to no such countervailing interests. A tort action, indeed, traditionally requires even less contact with the forum than an ordinary action

---

[31] This view has the support of the Court of Appeals for the Fifth Circuit. See, New York Times Co. v. Connor, 365 F. (2d) 567; Buckley v. New York Times Co. 338 F. (2d) 470.

in contract. See, *Developments in the Law: State-Court Jurisdiction,* 73 Harv. L. Rev. 909, 926.[32]

Assertion of jurisdiction over all the defendants in this case does not offend our notions of fundamental fairness. There is no apparent inconvenience of the forum, and, as a practical matter, the nature of the litigation and the situation of the available witnesses and evidence makes it rather apparent that any single defendant, if not tried in this forum and in these same proceedings, would probably not face trial anywhere. Minnesota, so far as appears, is the only state having significant contacts with all the defendants to this complicated multiparty litigation.[33] With respect to those several defendants who appeared in St. Paul on March 24, 1966, to say that it would be unfair to subject them to suit would mean that the line of convenience is drawn between coming to Minnesota to conspire and coming to Minnesota to defend an action based upon the conspiracy. With respect to any of the defendants, to suggest that it is unfair to require them to respond to an action in this jurisdiction would

---

[32] Consistent with the thesis that the type of contact is important is the attempt by some commentators to define certain activities that so justifiably invoke the protective interests of the state that only minimal contacts are necessary. Among such activities are operation of a motor vehicle (Hess v. Pawloski, 274 U. S. 352, 47 S. Ct. 632, 71 L. ed. 1091); dealing in securities (Henry L. Doherty & Co. v. Goodman, 294 U. S. 623, 55 S. Ct. 553, 79 L. ed. 1097); and dealings in insurance (McGee v. International Life Ins. Co. 355 U. S. 220, 78 S. Ct. 199, 2 L. ed. [2d] 223).

[33] Our decision on these appeals, it is appropriate to underscore, is not determinative of the issues of jurisdictional fact as they may relate to a judgment on the merits. As the trial progresses, it may be made more manifest that contacts of a defendant with this forum and the alleged conspiracy have not been in fact established, in which event it will be for the trial court to consider a defendant's renewed motion to dismiss. According to some of the parties, a trial court order precluded extended discovery that might well have developed additional evidence relevant to the issue of jurisdiction. We assume this order may now be modified preparatory to trial upon the merits.

seem to say that they may rely on our contract law to uphold the terms of lawful agreements but that they may not be required to defend an action based on injury to our citizens as a result of an unlawful agreement.

If one of these defendants had injured a Minnesota resident in driving a rented car from the airport to the meeting in St. Paul, on March 24, 1966, none would challenge assertion of Minnesota jurisdiction. Hess v. Pawloski, 274 U. S. 352, 47 S. Ct. 632, 71 L. ed. 1091. And even if it were a defendant's agent who came into this state and injured a Minnesotan, liability for the tort would just as clearly exist. Nelson v. Miller, *supra*. How, then, should we decline jurisdiction when the agent arrives at his location and participates in other tortious conduct, the result of which is injurious to numerous Minnesotans? Similarly, a supplier of goods is subject to the power of the state in which the defects bring about harmful physical effects. Gray v. American Radiator & Standard Sanitary Corp. 22 Ill. (2d) 432, 176 N. E. (2d) 761; Aftanase v. Economy Baler Co. (8 Cir.) 343 F. (2d) 187 (construing Minn. St. 303.13); Smyth v. Twin State Improvement Corp. 116 Vt. 569, 80 A. (2d) 664, 25 A. L. R. (2d) 1193. How, then, should it be offensive to assert jurisdiction of an action against persons who intentionally set in motion financial actions of the kind alleged in this case, the inescapable effect of which is to injure Minnesotans?

Jack O'Donnell Chevrolet, Inc. v. Shankles (N. D. Ill.) 276 F. Supp. 998, in a situation quite similar to the instant case, answers these rhetorical questions. Plaintiff, an Illinois car dealer, alleged that defendant, an Alabama bank, was conspiring with a car buyer to honor only those of the buyer's drafts which he gave specific authority to honor. The Federal District Court refused to quash service under the Illinois long-arm statute, ruling that it was permissibly applicable to subject the Alabama bank to Illinois jurisdiction. Relevant to the construction we have

made of our own comparable statute, the court said (276 F. Supp. 1002):

"* * * [C]ases interpreting Gray [Gray v. American Radiator & Standard Sanitary Corp. 22 Ill. (2d) 432, 176 N. E. (2d) 761] have confirmed that an actor need not be physically present in Illinois in order to commit a 'tortious act' which would subject him to jurisdiction under [the Illinois act]. * * * The cases cited by defendant in support of his motion, antedated Gray, and were based upon an outdated conception of due process requirements, namely that the actor must have been physically present in the state of injury, and accordingly they are no longer controlling. It cannot be seriously contended any longer that the personal 'presence' of a nonresident defendant is necessary, in this state, in order for it to be subjected to the *in personam* jurisdiction of this court."

## VI.

Quite a different constitutional hurdle has been erected by the Las Vegas banks in defense to the third-party actions brought by Fidelity. Minn. St. 543.19, under which Fidelity made service upon them, in its body recites express authority to exercise personal jurisdiction over "any foreign corporation or any non-resident individual." When enacted, however, it was entitled "An act relating to the service of process upon non-resident individuals." L. 1967, c. 427. Minn. Const. art 4, § 27, provides that "[n]o law shall embrace more than one subject, which shall be expressed in its title."

The reason for this constitutional provision has been stated in State ex rel. Pearson v. Probate Court, 205 Minn. 545, 551, 287 N. W. 297, 300, affirmed, 309 U. S. 270, 60 S. Ct. 523, 84 L. ed. 744, 126 A. L. R. 530:

"The objects of the constitutional provision have been often expressed in the decisions of this court. They are, first, to prevent 'log-rolling legislation' or 'omnibus bills,' by which a large number of different and disconnected subjects are united in one

bill and then carried through by a combination of interests; and, secondly, to prevent surprise and fraud upon the people and the legislature by including provisions in a bill whose title gives no intimation of the proposed legislation, or of the interests affected."

Its basic meaning was stated in Johnson v. Harrison, 47 Minn. 575, 577, 50 N. W. 923, 924, 28 A. S. R. 382, 384:

"* * * All that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject."[34]

We hold, by reference to these principles, that the statute is not fatally defective. The subjects are not fundamentally different or disconnected. The legislators could not have been misled by the title to this statute, which was to reach nonresidents who had injured Minnesota citizens. There is no reason to think that a legislator voting to allow the state's long-arm statute to reach individuals would have voted differently as to its reaching corporations.

## VII.

Although lack of personal jurisdiction is the principal issue in these appeals, appellant Nevada State Bank claims that Minnesota courts have no subject-matter jurisdiction. Montgomery was appointed receiver in West Virginia on June 15, 1966, but

---

[34] See, also, State v. Gut, 13 Minn. 315 (341); State ex rel. Olson v. Erickson, 125 Minn. 238, 146 N. W. 364; Sverkerson v. City of Minneapolis, 204 Minn. 388, 283 N. W. 555, 120 A. L. R. 944; Blanton v. N. P. Ry. Co. 215 Minn. 442, 10 N. W. (2d) 382; City of Duluth v. Cerveny, 218 Minn. 511, 16 N. W. (2d) 779; State v. Meyer, 228 Minn. 286, 37 N. W. (2d) 3. That it is to be liberally construed is stated in Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635; C. Thomas Stores Sales System, Inc. v. Spaeth, 209 Minn. 504, 297 N. W. 9.

Hunt's predecessor as conservator was not appointed until June 17, 1966. The statutory point is that under West Virginia Code § 33-10-14(b)[35] North Central's assets and rights of action had vested in Montgomery, so that under Minnesota's Uniform Liquidation of Insurance Companies Act[36] no action was to be "commenced or continued" in Minnesota "unless initiated, or consented to" by West Virginia. This defendant, accordingly, initially argues that the Minnesota conservatorship proceedings were invalid and that there was no conservator to commence the present action in Minnesota.

We do not accept this argument. The present action is a different action than the initial conservatorship proceedings. The West Virginia Code, quoted in footnote 35, *supra*, clearly contemplates that receivers in other states shall have all necessary rights and powers with respect to assets located in such other states, so that the Minnesota conservatorship was not a nullity

---

[35] "As domiciliary receiver, the commissioner shall be vested by operation of law with the title to all the property, contracts, and rights of action and all of the books and records of the insurer, wherever located, as of the date of entry of the order directing him to rehabilitate or liquidate a domestic insurer or to liquidate the United States branch of an alien insurer domiciled in this State and he shall have the right to recover the same and reduce the same to possession; except that ancillary receivers in reciprocal states shall have, as to assets located in their respective states, the rights and powers which are herein prescribed for ancillary receivers appointed in this State as to assets located in this State."

[36] Section 60A.04, subd. 18, provides: "When a proceeding for rehabilitation, reorganization, or liquidation is commenced in a reciprocal state against an insurer domiciled in such state and doing business in this state, title to all of the assets of such insurer, except special deposits, as hereinafter provided, then located in this state shall vest in the insurance supervisory or other administrative agency of such reciprocal state. Thereafter no action or proceeding against such insurer of such assets, except such special deposits, *shall be commenced or continued* in the courts of this state unless initiated, or consented to, by such insurance supervisory or other administrative agency of such reciprocal state." (Italics supplied.)

as to at least the assets of North Central in Minnesota. Hunt, therefore, was a legal conservator with capacity to commence the present action.

Nevada State Bank next, and more insistently, argues that West Virginia has not effectively consented to the instant action in Minnesota. There were, as previously noted, two "consents" granted by the West Virginia commissioner to the Minnesota commissioner, allowing the latter to begin legal actions. Defendant contends that the February 26, 1968, consent[37] went to the conservatorship proceedings, not to the instant suit (thus implicitly recognizing the distinction we made in the previous paragraph). It does not attack the specificity of the March 29, 1968, consent,[38] but notes that it came after the present suit was

---

[37] "I, FRANK R. MONTGOMERY, as Commissioner of Insurance of the State of West Virginia, pursuant to the laws of the State of West Virginia and the Order of the Court dated the 15th day of June, 1966, duly made and filed on said day, join and consent to the attached Complaint and the legal action therein set forth with Plaintiff Thomas C. Hunt, Commissioner of Insurance of the State of Minnesota, as Conservator and Trustee of the assets of North Central Fire and Casualty Company located within the State of Minnesota.

"Authorization is hereby expressly given for Plaintiff Thomas C. Hunt to commence, proceed with and prosecute to conclusion, *said legal action* against the defendants named in said Complaint.

* * * * *

"[signed] FRANK R. MONTGOMERY"

(Italics supplied.)

[38] "I, FRANK R. MONTGOMERY, Insurance Commissioner of West Virginia and receiver of North Central Fire & Casualty Co., hereby consent to, authorize and ratify the commencement and prosecution of the following specific litigation:

"(1) Thomas C. Hunt, Conservator and Trustee of North Central Fire & Casualty Co. vs. Nevada State Bank, et al., File No. 357743, Ramsey County District Court, State of Minnesota.

"(2) Thomas C. Hunt, Conservator and Trustee of North Central Fire & Casualty Co. vs. Don F. Roberts, et al ($750,000), in the Circuit court of Missouri for the 16th Judicial District.

initiated. It argues that § 60A.04, subd. 18, means that the West Virginia commissioner can effectively consent only before a Minnesota action has been commenced.

We cannot agree with this reading of § 60A.04, subd. 18. The last sentence of that subdivision uses the terms "initiated, or consented to." Nevada State Bank would say that both mean actions preliminary to filing suit, initiation being, for example, when the West Virginia commissioner files the Minnesota action, and consent being when he approves Hunt's initiation, before suit is filed. Read in this way the terms are not redundant. But such a reading is inconsistent with "or continued" in the previous line. "Continued" can only be read to mean that if an action is begun without consent, as is present here if the February 26 document is invalid, it can be *continued* if there is subsequent consent, which was made on March 29.

## VIII.

The Las Vegas banks, as previously stated, contend that North Central's Texas receiver is an indispensable party, the nonjoinder of which compels dismissal of these actions. The parties are agreed only upon the fact that there is a receivership in Texas, but the facts surrounding the establishment of that receivership are far from clear. Hunt asserts that it is merely an ancillary receiver, bound by the result in the Minnesota action. Although defendants have admitted on oral argument that the receiver is ancillary, they contend that this Minnesota action will have no res judicata effect in the event of any subsequent action by that receiver.

Approaching the dispute in the context of a pretrial motion to dismiss made by the defendants, we must give every credit to the facts well pleaded and the collateral evidence supporting

"(3) Thomas C. Hunt, Conservator and Trustee of North Central Fire & Casualty Co. vs. Don F. Roberts, et al. ($75,000 $1,250) [sic] in the Circuit Court of Missouri for the 16th Judicial District.

\* \* \* \* \*

"[signed] FRANK R. MONTGOMERY"

it. Plaintiff's Exhibit A, in Appeals No. 41699 and No. 41700, is a supporting document[39] by which, pursuant to Rule 20, Rules of Civil Procedure, Montgomery joined in the Minnesota action and, in addition, agreed that the entire receivership, including the Texas ancillary receiver, will be bound by the outcome of the Minnesota action.

The trial court had issued orders dated August 18, 1968, and March 26, 1969, prohibiting discovery pending disposition of these motions. Future opportunity for discovery may be expected to elucidate the nature of the Texas receiver and elicit any intention it may have not to be bound by the result of this action. If there is indeed a conservator or receiver in another state who will not be bound by the judgment in this state (either by agreement or by being made a party to the actions), it remains open to the trial court to determine whether the action should be dismissed for nonjoinder of an indispensable party.

## IX.

The last question we must answer is that raised by Murphy with respect to the order denying Murphy leave to serve all of its third- and fourth-party complaints. First National, as previously noted, had moved to serve third- and fourth-party

---

[39] "* * * I, FRANK R. MONTGOMERY, hereby join in the above entitled action as an additional party plaintiff for the purpose of asserting and joining in the same claims for relief as have been asserted heretofore by Thomas C. Hunt; I further state in addition:

* * * * *

"3.) That some of the defendants herein have asserted the defenses of lack of the real party in interest and improper joinder and lack of joinder of parties plaintiff; that, without conceding or admitting the validity of those objections and defenses in the interests of expediting the prosecution and maintenance of this action, I join in this action as a party plaintiff and state and agree that the entire receivership, including the ancillary receivership in the State of Texas and the Conservatorship in the State of Minnesota, shall be bound by the results of this action and shall be foreclosed by any judgments rendered herein."

complaints in May 1968. At that time Murphy made similar motions, but it withdrew them when First National was making its oral argument. On September 4, 1968, Judge Stewart granted First National's motions except as to Delta. (Neither First National nor Murphy had included Burke or the two Pioneer companies in their motions.)

On November 26, 1968, Murphy again filed its third- and fourth-party motions, this time naming more defendants. On January 14, 1969, the trial court granted Murphy's motions except as to Burke, the Pioneer companies, and Delta. Murphy appeals from the denial of its motions as to these defendants.

It is obvious that Murphy was inexcusably dilatory. Rule 14.01, Rules of Civil Procedure, provides in part:

*"Within 45 days* after the service of the summons upon him, and thereafter by leave of court granted on motion upon notice to all parties to the action, a defendant as a third-party plaintiff may serve a summons and complaint, together with a copy of plaintiff's complaint, upon a person, whether or not he is a party to the action, who is or may be liable to him for all or part of the plaintiff's claim against him." (Italics supplied.)

The official note relative to the rule states that "an application made after the free period will be granted only under exceptional circumstances." 27A M. S. A. p. 396. As the case was situated when Judge Stewart made his rulings, there was no error in denying leave as to Burke and Delta. They were not parties as the matter then stood, so it would have worked hardship to make them specially defend in one small part of a long and complicated lawsuit. We would ordinarily affirm the trial court's order without discussion. However, we think the circumstances are sufficiently extraordinary to warrant allowance of the Murphy motion. This is not to be construed, however, as condonation of Murphy's delay nor an emasculation of the discretion vested in the trial court. It is only a recognition of the unique dependency of the procedural issues raised by the motions to serve third- and

fourth-party complaints upon the composition of the main action. We have held the defendants subject to suit in the main action, and it has been assumed by all that Murphy would proceed against these defendants by separate action if it could not bring them into the present action as third- and fourth-party defendants. To make these defendants argue identical defenses in two Minnesota courts, in trials based on identical facts, would create an unnecessary expense for the parties and unnecessarily burden the judicial machinery of the state. Only for these reasons do we reverse the order denying leave to make service upon Delta, the Pioneer companies, and Burke.

Affirmed in part; reversed in part.