## NORTHWESTERN NATIONAL BANK OF ST. PAUL
## v. WILLIAM J. KRATT AND OTHERS.
## JAMES SCHEER, APPELLANT.

226 N. W. 2d 910.

March 7, 1975—No. 44942.

*Richards, Montgomery, Cobb & Bassford* and *Lynn G. Truesdell III,* for appellant.

*Doherty, Rumble & Butler* and *John G. Hoeschler,* for respondent.

Heard before Peterson, Todd, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

This is an appeal from an order of the Ramsey County District Court denying defendant James Scheer's motion to quash, vacate, and set aside the service of a summons and complaint on the basis that the court lacks personal jurisdiction over him. Plaintiff, Northwestern National Bank of St. Paul, commenced an action against Namekagon Development Company, Inc., after the latter had defaulted upon a first mortgage note with plaintiff

in the amount of $900,000, with interest of 9 percent per annum. Plaintiff obtained a default judgment against Namekagon in the amount of $350,099.01. Upon the failure of Namekagon to satisfy the judgment, plaintiffs sought recovery from the alleged guarantors, defendants William Kratt, Chester LaChecki, and James Scheer. Defendant Scheer seeks review of the order denying his motion. We affirm.

Namekagon is a Wisconsin corporation which made application for a certificate of authority to transact business in Minnesota on September 13, 1971. To obtain financing for two turnkey housing projects in Pine City and Nett Lake, Minnesota, Namekagon executed and delivered to plaintiff a note secured by a mortgage deed on properties located in St. Louis and Koochiching counties in Minnesota. Further, a guaranty was signed by Kratt, LaChecki, and Scheer, who were listed in Namekagon's application for a certificate of authority to transact business in Minnesota as the president, secretary, and treasurer, respectively, of the corporation. Scheer owns 25 percent of the total outstanding shares of stock in Namekagon.

Defendant Scheer is a resident of Illinois. He admits to having signed the guaranty in Illinois. Moreover, he claims that he has not transacted any business in this state, and that he has not entered this state to discuss, negotiate, or execute any document in connection with the loan, with the exception of satisfying plaintiff's request for a meeting with the guarantors in January 1973.

William A. Reeves, a former officer of plaintiff, stated in an affidavit that on or about April 26, 1971, he met with Scheer and Kratt in St. Paul to discuss the possibility of financing the two development projects that ultimately led to the financial arrangement with which we are here concerned. Scheer had originally telephoned Lyman H. Coult, Jr., a loan officer of Northern Surety Company in St. Paul, in the spring of 1971 to solicit financial assistance from Northern, and Scheer subsequently met with him on at least one occasion in St. Paul to discuss the terms of

both the Nett Lake and Pine City projects. Mr. Coult arranged Scheer's meeting with Mr. Reeves.

Mr. Gerald Spandl, chief of the architecture and engineering section of the local office of the Department of Housing and Urban Development, stated in an affidavit that his records indicate that Scheer communicated with HUD on February 2, 1971, and March 1, 1971, by letters to Mr. Robert Buzza of the Chicago HUD office. Scheer also wrote a letter to the Chicago HUD office on April 20, 1971. Each of these communications concerned the activity of Namekagon in the Minnesota projects. The first letter is signed by Scheer as secretary-treasurer, while the other two have no title designation. The HUD records also disclose that Scheer visited the construction site at Nett Lake on February 13, 1973.

On February 7, 1973, Mr. James Gardner, who is in charge of the real estate banking department of plaintiff and who succeeded Reeves in that position, was present with one Jerry Weiss of the bank at a meeting with Kratt, LaChecki, and Scheer concerning the financial details and costs of Namekagon's Nett Lake project. Gardner's affidavit states that Scheer wanted to reconfirm cost figures with HUD so that an agreement could be reached by all concerning the proper course to complete the project or minimize the loss to Namekagon. Gardner states that he and Weiss made it clear that the bank would not do anything unless all principals of Namekagon were in agreement. Scheer stated that he would contact HUD personally and let the bank know his position. On the telephone on February 9, 1973, Gardner talked to Scheer who indicated that he was going to Nett Lake to inspect the project personally. On February 14, 1973, Scheer called plaintiff and, after outlining a proposed plan and reviewing cost figures, stated that a decision could not yet be made but that he had used his personal funds to meet the payroll so that the project could continue. Scheer called again on March 19, 1973, relative to a notice of cancellation he had received from the Indian organization for whom the project was being built,

and said that he had talked to HUD, the Indian organization's attorney, and his partners, but that no decision was reached regarding the project's completion.

Our primary concern is whether the district court is vested with personal jurisdiction over Scheer under Minn. St. 543.19, subds. 1(b) and 3, for purposes of this contract action by plaintiff, and further, whether the application of this statute deprives Scheer of due process in this action so as to be unconstitutional.

The statute upon which the court's exercise of personal jurisdiction is based is Minn. St. 543.19, which provides in pertinent part:

"Subdivision 1. As to a cause of action arising from any acts enumerated in this subdivision, a court of this state with jurisdiction of the subject matter may exercise personal jurisdiction over any foreign corporation or any non-resident individual, or his personal representative, in the same manner as if it were a domestic corporation or he were a resident of this state. This section applies if, in person or through an agent, the foreign corporation or non-resident individual:

\* \* \* \* \*

"(b) Transacts any business within the state, \* \* \*

\* \* \* \* \*

"Subd. 3. Only causes of action arising from acts enumerated in subdivision 1 may be asserted against a defendant in an action in which jurisdiction over him is based upon this section."

The basic principles upon which the expansive long-arm jurisdiction theory has relied have been reiterated throughout case law, beginning with the landmark case of International Shoe Co. v. Washington, 326 U. S. 310, 66 S. Ct. 154, 90 L. ed. 95 (1945). Such cases began compiling a list of tests to be applied before a valid extension of one state's jurisdiction over a nonresident defendant could be effectuated. Included in that list was the requirement that the defendant have certain minimum contacts

with the forum state such "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U. S. 316, 66 S. Ct. 158, 90 L. ed. 102.[1]

The court, in Aftanase v. Economy Baler Co. 343 F. 2d 187, 197 (8 Cir. 1965), attempted to set forth guidelines and then apply them to the facts presented. These guidelines include (1) quantity of the contacts; (2) quality of the contacts; (3) connection between the cause of action and the contacts; (4) interest of the state in providing a forum for an injured resident; and (5) convenience of the parties.[2]

But despite the intangible nature of the theory of jurisdiction, this and other courts have attempted to apply these phrases and to discuss facts, as presented, within the guidelines of Aftanase. The result is a straight line progressing toward expansion of the long-arm doctrine, with occasional lapses into traditional notions of jurisdictional theories.

In Hutter Northern Trust v. Door County Chamber of Commerce, 403 F. 2d 481 (7 Cir. 1968) the court, in interpreting Ill. Rev. St. 1967, c. 110, § 17, from which Minn. St. 543.19 is derived, held that where alleged torts committed by a Wisconsin county chamber of commerce were *closely related* to acts which were the bases of Illinois personal jurisdiction over the chamber, tort claims could be heard by district courts sitting in Illinois.

---

[1] See also, Perkins v. Benquet Consol. Min. Co. 342 U. S. 437, 445, 72 S. Ct. 413, 418, 96 L. ed. 485, 492 (1952) ("amount and kind of activities"); McGee v. International Life Ins. Co. 355 U. S. 220, 223, 78 S. Ct. 199, 201, 2 L. ed. 2d 223, 226 (1957) (whether contract had "substantial connection" with the state; and regard for the state's manifest interest in providing an effective means of redress for its residents); Hanson v. Denckla, 357 U. S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. ed. 2d 1283, 1298 (1958) ("essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State").

[2] See, also, Mid-Continent Frgt. Lines v. Highway Trailer Indus. 291 Minn. 251, 190 N. W. 2d 670 (1971); Franklin Mfg. Co. v. Union Pacific R. Co. 297 Minn. 181, 210 N. W. 2d 227 (1973).

In O'Hare International Bank v. Hampton, 437 F. 2d 1173 (7 Cir. 1971), the court held that jurisdictional facts had been alleged to establish "minimum contacts" so that personal jurisdiction over the nonresident defendant did not offend "traditional notions of fair play and substantial justice." The court in support of its determination stated:

" The defendants certainly must have contemplated the effects in Illinois of a failure to make the monthly rental payments. See Jack O'Donnel Chevrolet, Inc. v. Shankles, 276 F. Supp. 998, 1003 (N. D. Ill. 1967). Furthermore, the fact that the guaranty was to be construed according to Illinois law and performed in that state clearly demonstrates that the defendants 'invoked the benefits and protection' of the state. [Citations omitted.]

\* \* \* \* \*

"While the guarantors received no direct consideration, it appears there was inducement in connection with their projected interest in World Travelers for them to want eventual financing of the airplane to be purchased. They should not be in the position, even though indirectly, to enjoy the fruit but to disavow the situs of the tree from which the fruit was derived. The purchase money bore an Illinois badge sufficient with the other facts hereinbefore set out to constitute a prima facie showing of transacting business within the state of Illinois." 437 F. 2d 1177.

It seems clear that Scheer was "transacting business" in Minnesota as contemplated by the statute. His contention that his activities must give rise to this particular cause of action, based upon the signing of the guaranty itself, construes the statute more strictly than was intended by the legislature. There is evidence of more than sufficient minimal contacts by the defendant with this state in order to allow the latter to exercise personal jurisdiction without offending traditional notions of due process.

We therefore hold that the lower court's exercise of jurisdiction over this nonresident defendant neither violates traditional standards of fair play and substantial justice, nor does it go

beyond the perimeters permitted by the Fourteenth Amendment due process provisions.

Affirmed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.