MEDTRONIC, INC., Plaintiff,

v.

MINE SAFETY APPLIANCES COMPA-
NY and Catalyst Research
Corporation, Defendants.

No. 4–77–Civ. 201.

United States District Court,
D. Minnesota,
Fourth Division.

April 4, 1979.

Richard B. Solum, Henson & Efron, Minneapolis, Minn., Robert O. Vidas, Schroeder, Siegfried, Ryan & Vidas, Minneapolis, Minn., for plaintiff.

Benno F. Wolff, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., for defendants.

## MEMORANDUM ORDER

LARSON, Senior District Judge.

This is an action for declaratory relief brought pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiff Medtronic, Inc. (Medtronic) seeks a declaratory judgment that two patents held by defendant Catalyst Research Corporation (CRC) pertaining to the lithium-iodine (Li/I) batteries used in cardiac pacemakers are invalid and not infringed by plaintiff. Plaintiff Medtronic is a Minnesota corporation and a leading manufacturer of cardiac pacemakers. Defendant Mine Safety Appliances Company (MSA) is a Pennsylvania corporation licensed to do business in Minnesota which manufactures and sells industrial safety devices. Defendant CRC is a wholly owned subsidiary of MSA with its principal place of business in Maryland. Most importantly for purposes of this litigation, however, CRC is the sole owner of the two patents in dispute: United States Letters Patent No. 3,660,163 for "Solid State Lithium-Iodine Primary Battery" (the Moser Patent) and No. 3,674,562 for "Primary Cells and Iodine Containing Cathodes Therefor" (the Schneider Patent).

In response to plaintiff's complaint, both defendants have moved for dismissal. Specifically, defendant CRC has moved to dismiss on grounds that this Court lacks subject matter jurisdiction (Fed.R.Civ.P. 12(b)(1)) and the complaint fails to state a claim upon which relief can be granted (Fed.R.Civ.P. 12(b)(6)) because at the time the complaint was filed there did not exist a justiciable controversy between the parties. Defendant CRC has also alleged that plaintiff has failed to present facts sufficient to sustain the exercise of personal jurisdiction over CRC under either of Minnesota's two long arm statutes, M.S.A. §§ 303.13 and 543.19. Defendant MSA has moved to dismiss on grounds of lack of subject matter jurisdiction asserting that no actual controversy exists between plaintiff and MSA since the patents in question are owned by CRC alone and are not subject to MSA's control.

With respect to CRC's motion to dismiss for lack of personal jurisdiction, Medtronic

has filed a counter motion seeking an award of the attorneys' fees incurred in opposing CRC's motion. Medtronic contends that attorney's fees are appropriate because CRC's claim is so groundless, given prevailing case law, as to constitute harassment of plaintiff and a waste of this Court's time.

The Court will address the motions before it seriatim beginning with defendant CRC's motion to dismiss for lack of a justiciable controversy.[1] The existence of an "actual controversy" between the parties is, of course, more than simply a requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201; it is essential to sustain jurisdiction under the Constitution. *Sherwood Medical Industries, Inc. v. Deknatel, Inc.*, 512 F.2d 724, 726 (8th Cir. 1975); *Mine Safety Appliance Co. v. Energetics Science, Inc.*, 416 F.Supp. 530, 531 (S.D.N.Y.1976). The fundamental question to be asked in any declaratory judgment action is whether the facts reflect the existence of a concrete dispute between adverse parties of such immediacy that a judicial declaration of rights is warranted. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Medtronic, Inc. v. American Optical Corporation*, 327 F.Supp. 1327, 1330 (D.Minn.1971). Whether or not such a dispute or controversy exists is necessarily a question of degree, highly dependent on the facts of each case. Clearly, hypothetical or abstract questions are not suitable for declaratory judgment. At the same time, it is not essential that there be an explicit threat of litigation. While it has generally been held that an actual controversy exists in patent cases only when the defendant-patentee in a declaratory judgment action has expressly or impliedly charged the plaintiff with infringement, the requirement of a charge of infringement has been liberally construed. *Sherwood Medical Industries, Inc. v. Deknatel, Inc., supra*, at 727; *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 439 F.2d 871, 874 (1st Cir. 1971); *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 504 (2d Cir. 1968). In *Sherwood Medical Industries, Inc. v. Deknatel, Inc.*, the Eighth Circuit indicated that a charge of infringement sufficient to invoke the Declaratory Judgment Act may be inferred from:

"any conduct or course of action on the part of the patentee which would lead a reasonable man to fear that he or his customers face an infringement suit or the threat of one if he continues or commences the activity in question." 512 F.2d at 728.

The touchstone then is a "reasonable apprehension" on the part of the plaintiff that should he proceed with the activity in question, the defendant-patentee will institute legal action against him. *Japan Gas Lighter Association v. Ronson Corp.*, 257 F.Supp. 219, 237 (D.N.J.1966). *See also Medtronic, Inc. v. American Optical Corp., supra*, at 1333; *Owatonna Manufacturing Co. v. Melroe Co.*, 301 F.Supp. 1296, 1299 (D.Minn. 1969). In determining whether a charge can be reasonably inferred from a defendant-patentee's conduct, *Sherwood* instructs that a court must examine the *"entire course of action* and *all* of the defendant's relevant conduct."* 512 F.2d at 728 [Emphasis in original]. The court's judgment, furthermore, must be "pragmatic" and indicate an awareness of the "business realities" in the case before it. *Id.*

It is with the *Sherwood* standard in mind that this Court has examined the facts presented in the instant case.

The facts relevant to defendant CRC's Rule 12(b)(1) and 12(b)(6) motions date back to the early 1970's. At that time, CRC, seeking entrance into the cardiac pacemaker industry for its lithium iodine (Li/I) power sources began to use Wilson Greatbatch Ltd. (Greatbatch) as its exclusive sales agent for the medical market. In 1972 Greatbatch was granted an exclusive license by CRC under the two patents at

---

1. Defendant's motion is made in part pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because affidavits and other materials outside the pleadings have been considered by the Court, this motion must be treated as one for summary judgment pursuant to Fed.R.Civ.P. 56.

issue here. Subsequently Greatbatch called on Medtronic at Medtronic's offices in Minneapolis several times each year to promote the application of CRC's Li/I cells to Medtronic's products and to discuss the possibility of technical assistance from Medtronic relative to this application (Fester Affidavit at ¶ 2). Medtronic was clearly a giant in the pacemaker industry at this time and the deposition testimony and affidavits contained in the record abundantly reflect CRC's great interest in promoting and perpetuating an ongoing vendor/vendee relationship with Medtronic.

The initial purchases by Medtronic of Li/I cells from Greatbatch eventually resulted in direct contractual undertakings between Medtronic and CRC. In August 1974 the parties entered into a non-disclosure agreement encompassing technology exchanges in furtherance of developing Li/I cells for pacemaker use (Knapp Affidavit at ¶ 2). Subsequently, in 1975, the parties entered into a second agreement—a joint research and development agreement concerning the production of specially designed Li/I batteries for possible use in Medtronic Pacemakers.

As a result of the technological exchanges between Medtronic and CRC, Medtronic became convinced that the Li/I power source was so critical to pacemaker development that it was necessary for Medtronic to achieve internal manufacturing control over it (Mahle Affidavit at ¶ 2). Medtronic's determination that it could not be dependent on an outside vendor for its Li/I cells and its desire to achieve internal manufacturing capability were made known to MSA/CRC personnel as early as the fall of 1974. In October 1974 Mr. Norm Dann, then vice president of Medtronic, met with Mr. Milton Hulme, president of CRC and a vice president of MSA, and Mr. Frederick Tepper, general manager of CRC, in Pittsburgh, Pennsylvania, (MSA's corporate headquarters) to discuss Medtronic's possible acquisition of CRC, or at least the lithium-iodine portion of the business. Subsequently, MSA/CRC informed Medtronic that an acquisition did not appear to be in their best interests (Dann Deposition at 22).

In connection with the discussions preceding this decision, however, Mr. Tepper assured Mr. Dann that CRC's patents were valid and strong and that he had written them himself (Dann Deposition at 21). Mr. Hulme has acknowledged in deposition testimony that during this time period he and Mr. Tepper discussed the relationship between Medtronic's expressed intent to develop its own capacity to manufacture Li/I cells and the protection afforded CRC by the Mosser-Schneider patents (Hulme Deposition at 138–39).

During 1975 various meetings occurred between Medtronic officials and representatives of CRC or MSA at which it was made clear to the CRC/MSA representatives that Medtronic was interested in manufacturing the Li/I cells which Greatbatch was then selling to Medtronic and the specially designed Li/I cell which CRC and Greatbatch had been developing for Medtronic. Both cell models were ones over which CRC purported to have patent protection (Mahle Affidavit at ¶ 4). In the summer of 1975 Medtronic and CRC began a series of patent license negotiations culminating in a proposal by Mr. Tepper that Medtronic take a paid-up license under the Moser-Schneider patents. Contemporaneously with these discussions, Medtronic began to investigate the validity of the Moser-Schneider patents (Mahle Affidavit at ¶ 3).

In September 1975 Messrs. Tepper, Hulme and Kulp, all officers and employees of CRC, visited Medtronic in Minneapolis to discuss a patent license. At this meeting, CRC offered Medtronic a paid-up license and other technology for six million dollars. CRC reiterated its faith in the strength and enforceability of the Moser-Schneider patents (Mahle Affidavit at ¶ 5). Following the meeting Medtronic began a more intense study of the validity of the Moser-Schneider patents. In part because this research raised questions as to the validity of the two CRC patents and in part because CRC informed Medtronic that its Li/I battery design for Medtronic was dependent upon certain improvement patents owned by Greatbatch, Medtronic ultimately reject-

ed CRC's paid-up license proposal. The parties had no further negotiations in 1975.

In 1976, however, CRC and Medtronic again engaged in discussion concerning Medtronic's expressed intention to manufacture a Li/I battery cell, the lack of any license agreement between the parties, and Medtronic's growing conviction that the Moser-Schneider patents were invalid (Mahle Affidavit at ¶ 7). At Mr. Hulme's suggestion, counsel for both sides became involved in the negotiations. In February 1976 MSA's patent counsel suggested to Medtronic that it supply CRC with any information it had concerning prior art that disputed the Moser-Schneider patents.

Contemporaneously, Medtronic began negotiations with Greatbatch leading toward a technology exchange agreement in furtherance of Medtronic's desire to achieve internal capability to manufacture the Li/I battery. Greatbatch by this time was no longer CRC's exclusive agent and had acquired patents on certain Li/I technology that could be used in the manufacture of Li/I powered pacemakers. These negotiations culminated in a license and technology exchange agreement entered into in March 1976. In connection with this agreement, Messrs. Mahle and Dann of Medtronic made a special trip to Pittsburgh to inform MSA/CRC representatives of the agreement prior to its public release. At this meeting Messrs. Tepper and Hulme informed Medtronic that under agreements then in existence between CRC and Greatbatch, Greatbatch did not have the right to sublicense CRC's Li/I patents and was precluded from transferring proprietary information relating to Li/I battery manufacture. The CRC representatives expressed their view that Medtronic would need a license from CRC to the extent that manufacture of batteries of the Greatbatch design came under the Greatbatch/CRC agreement. Mr. Dann acknowledged Medtronic's possible need for a license from CRC but claimed that Wilson Greatbatch had informed Medtronic that the CRC/Greatbatch agreement did not prevent his teaching Medtronic how to make batteries of the Greatbatch design. (Hulme Affida-

vit at ¶ 12; Tepper Affidavit at ¶ 10). Mr. Hulme responded that Medtronic should have its counsel begin work on a CRC/Medtronic license if, in fact, it appeared to be needed (Hulme Affidavit at ¶ 12). Neither Mr. Tepper nor Mr. Hulme charged Medtronic with infringement of CRC's Li/I patents nor did they expressly threaten suit if Medtronic went ahead with its agreement with Greatbatch. Mr. Hulme did, however, contest the information previously supplied to CRC by Medtronic concerning the possible invalidity of CRC's patents and reiterated CRC's conviction that the Moser-Schneider patents were fully enforceable. As Mr. Hulme stated in his affidavit:

"[I]t was of course our position that CRC would not be engaged in negotiating for a patent license agreement with anyone unless we believed our lithium/iodine power cell patents to be good and valid and entitled to a reasonable royalty. In fact, we consider them to be basic and pioneer patents, and I understand that others versed in this technology share our view. As a result, we obviously could not concur with any doubts Medtronic may have expressed concerning the validity of our patents. My response was that our patents are good and enforceable." (Second Hulme Affidavit at ¶ 6).

Mr. Hulme also informed Messrs. Mahle and Dann that MSA/CRC was then involved in patent litigation elsewhere, that litigation was not a preferable method of resolving patent disputes, but that CRC would resort to litigation if necessary. In the hope of avoiding litigation the parties agreed to exchange additional material relative to the issue of patent validity since, according to Mr. Hulme, this data would otherwise be discoverable in litigation anyway (Mahle Affidavit at ¶ 10).

Subsequent to this meeting and prior to implementation of the Medtronic/Greatbatch agreement, Medtronic began to be informed by Greatbatch that MSA/CRC was threatening suit against Greatbatch, Medtronic or both, presumably for violation of the CRC/Greatbatch non-disclosure agreement (Mahle Affidavit at ¶¶ 11, 12).

During this same time period, Medtronic's management reported hearing rumors within the pacemaker industry that MSA/CRC was prepared to sue Medtronic to prevent its manufacture of Li/I power sources (Perlman Affidavit at ¶ 3). Although neither the source nor the exact content of the alleged threats to sue is clear in all cases, it appears that Mr. Tepper, CRC's general manager, was the source on at least one occasion. Arthur Schwalm, president of Cardiac Pacemakers, Inc., a competitor of Medtronic, has testified to a conversation in March 1976 during which Mr. Tepper left Mr. Schwalm with the distinct impression that:

> "They, CRC, felt they had good patent coverage and the lithium-iodine cell and that they felt that anyone that went ahead and built lithium-iodine pacemakers would be in violation of their patent." (Schwalm Deposition at 19).

Along these same lines, in a letter of March 15, 1976, Mr. Tepper reported to Mr. Hulme:

> "I have alerted all potential lithium-iodine battery users of our basic patent position and also that Greatbatch's patent is nonassignable. Also, that we would actively defend our position." (Solum Affidavit at ¶ 5).

In May 1976 in the face of a growing controversy over the Medtronic/Greatbatch technology transfer agreement, CRC and Medtronic representatives again met. At this meeting, at which both parties were represented by counsel, Mr. Hulme reiterated his position that the Medtronic/Greatbatch technology transfer agreement infringed upon CRC proprietary information, that the patents underlying the Greatbatch battery design were enforceable, and that MSA/CRC would not hesitate to enforce them (Mahle Affidavit at ¶ 13; Rappaport Affidavit at ¶ 10). CRC continued to maintain this posture throughout 1976.

By the middle of 1976 Medtronic had invested substantial sums of money in hiring and training employees, purchasing materials and equipment, and constructing a manufacturing facility for the purpose of manufacturing the Li/I cell over which MSA/CRC claimed patent protection (Perlman Affidavit at ¶ 5). In anticipation of production of its first test cells, Medtronic, during the period from July through October 1976, concerned itself with the Moser-Schneider patents in two ways. First, it continued its investigation of the validity and scope of the patents, involving outside counsel and technical experts in this process. Second, it undertook exchanges of validity information and licensing proposals with CRC in an attempt to resolve what was becoming an increasingly intransigent negotiating position (Perlman Affidavit at ¶ 7). By late October 1976 Medtronic's initial doubts concerning the validity of CRC's patents had been reinforced by its subsequent research. In the face of this research, however, CRC showed no inclination to abandon its original licensing position and indeed increased the royalty demands included in its license proposals (Perlman Affidavit at ¶ 9). At a meeting concerning licensing held in Minneapolis on November 2, 1976, Lawrence Perlman, then executive vice president and general counsel for Medtronic, recalls Mr. Hulme telling him privately that:

> "the Moser-Schneider patents would be enforced should Medtronic begin to manufacture and use lithium-iodine cells absent a patent license agreement with CRC." (Perlman Affidavit at ¶ 8).

As Medtronic's plans for production of its Li/I cells went forward, Medtronic continued to negotiate with CRC in an effort to negotiate an acceptable license agreement. In February 1977 Mr. Hulme communicated with Mr. Perlman providing CRC's comments on a Medtronic license proposal. That letter concluded with a request by Mr. Hulme for an early response from Medtronic "particularly if you [Medtronic] are proceeding with your plans to make batteries covered by the involved patents." (Hulme Affidavit, Exhibit 50). Mr. Hulme has since stated in an affidavit that he did not know at the time he wrote his letter whether Medtronic was proceeding with its plans to make batteries covered by CRC's patents

or what Medtronic's actual intentions were in this regard (Hulme Affidavit at ¶ 25). On March 29, 1977, Mr. Perlman, who was well aware of the progress being made by Medtronic toward the production of Li/I cells purportedly covered by the CRC patents, responded to the proposals contained in Mr. Hulme's February letter with several counterproposals. Discussion continued between these parties throughout the following months without any resolution.

By late spring of 1977 Medtronic had produced its first test cells and was approaching manufacture of production cells. During this period an article written by two CRC employees came to Medtronic's attention which appeared to confirm Medtronic's growing conviction that CRC's Li/I battery patents were invalid. (Hulme Affidavit at ¶ 28). In the face of what Medtronic counsel Perlman regarded as intransigent negotiations, having determined that the Moser-Schneider patents were invalid, and with the possibility that Medtronic's Li/I cells would soon find their way out of Minnesota, thus inviting an infringement action in a foreign jurisdiction, Medtronic instituted this action for declaratory relief on June 8, 1977 (Perlman Affidavit at ¶ 10).

As support for its assertion that there was no justiciable controversy at the time this action was commenced, defendant CRC places great emphasis on the absence of any allegation in the complaint or any proof in the record that defendant has ever charged plaintiff with infringement of its Li/I battery patents. Defendant contends that the complaint and record are similarly devoid of any allegation that CRC ever threatened to sue plaintiff, plaintiff's customers or anyone else for infringement of its patents. The simple explanation for the absence of such allegations, asserts CRC, is that no officer, director, employee or agent of CRC has ever made such charges or threats.

Defendant further contends that it did not through its conduct impliedly charge plaintiff with infringement or threaten legal action. In this regard, defendant argues that plaintiff has mischaracterized its conduct as "attempting to force a patent license upon plaintiff" when in fact it was Medtronic that initiated license negotiations after MSA declined Medtronic's offer to acquire CRC. Defendant seeks to characterize any disagreements between Medtronic and CRC over the terms of a license agreement involving CRC's Li/I patents as nothing more than the normal give and take between parties engaged in business negotiations. In this regard CRC cites two cases from the Seventh Circuit in support of the proposition that disagreements during the course of mere license negotiations do not as a rule rise to the level of actual justiciable controversies: *American Needle & Novelty Co. v. Schuessler Knitting Mills*, 258 F.Supp. 98 (N.D.Ill.1966), *modified*, 379 F.2d 376 (7th Cir. 1967); *Walker Process Equipment v. F. M. C. Corp.*, 356 F.2d 449 (7th Cir. 1966). Defendant then elaborates on the holdings in these cases by suggesting that reliance upon such negotiations as the basis for finding the existence of an actual controversy is "offensive to the long standing judicial policy favoring compromise of disputes without resort to litigation." (Memorandum in Support of Defendant Catalyst Research Corporation's Motion to Dismiss at 21). Defendant suggests that Medtronic engaged in license negotiations in an attempt to lure defendant into a jurisdictional trap by eliciting a charge of infringement. In short, CRC accuses Medtronic of forum shopping and suggests that Medtronic's motive was to take advantage of an alleged tendency in the Eighth Circuit to find patents invalid.

▪ At the outset, it seems evident that whatever plaintiff's motives may have been in filing in this District, the vigor with which defendant has argued the motions now before the Court is motivated in large part by its desire to have this case tried in a jurisdiction which it perceives as more accommodating to patents. Beyond this, the Court rejects defendant's contention that some sort of public policy, analogous to the settlement privilege, militates against finding a controversy based on conversations occurring in the context of license negotia-

tions.[2] Defendant would have this Court expand the currently narrow privilege against the evidentiary use of conversations occurring in the context of negotiations aimed at settling a concretized dispute to include every aspect of licensing negotiations that might conceivably lead to a dispute in the future. To do so would mean that potential plaintiffs in a declaratory judgment action who engaged in licensing negotiations with patent holders would jeopardize their ability to obtain declaratory relief should they subsequently decide to contest the validity of the patents in question. In the opinion of this Court, the adoption of the position advocated by defendant would seriously undercut the Declaratory Judgment Act by allowing patent holders to immunize themselves effectively against the declaratory remedy by simply ensuring that any charge of patent infringement was made during a period when license negotiations were also taking place. Such a result is clearly contrary to the public policy favoring the discovery and termination of invalid patents.

■ Turning to the facts of this case, defendant's heavy reliance on the absence of any threat of litigation or charge of infringement as evidence that no actual controversy existed seems misplaced. It appears obvious to this Court that the primary reason why defendant had not threatened legal action for infringement prior to commencement of this action was that, until the middle of 1977, defendant felt that ongoing negotiations held the promise of a consummated license agreement that would obviate the need for any legal defense of defendant's patents. Plaintiff's decision to seek a declaration of patent invalidity signified the end to prospects of a negotiated license agreement. By the time this action was commenced, Medtronic was apparently firmly convinced of the invalidity of CRC's patents. Moreover, the parties were by this time hopelessly apart with respect to their positions concerning the financial terms of any possible license agreement. Viewing the record as a whole, it seems obvious that it was only a matter of time after the licensing negotiations terminated before defendant would file suit to enforce its patents. Thus, plaintiff's apprehension of imminent litigation was reasonable. Where such reasonable apprehension exists, plaintiff is not required to sit by and wait for the defendant to select the time and place in which to bring an infringement action, but may instead properly seek declaratory relief.

In reviewing the facts of this case, the Court has attempted to make allowance for potentially self-serving affidavits and deposition testimony. Viewed objectively and in its entirety, however, the Court thinks defendant CRC's course of conduct over a period of several years supports the conclusion that a justiciable controversy did exist at the time this action was filed. The Court has based its conclusion on a number of factors, none of which alone would necessarily create an apprehension of an impending infringement suit but which in combination reasonably support plaintiff's belief that it would soon face such a suit.

The first factor of consequence in this Court's analysis is the directly conflicting business interests of Medtronic and CRC. While Medtronic and CRC were not, at the commencement of this litigation, engaged in actual competition in the marketing of Li/I batteries, it is apparent that CRC had a substantial interest in maintaining a vendor/vendee relationship with plaintiff, one of the largest manufacturers of cardiac pacemakers. At the time this action was brought, Medtronic's power source purchases from CRC had been small. Medtronic, however, was a major purchaser of Li/I power sources from Wilson Greatbatch Ltd., until recently CRC's sole licensee under the Moser-Schneider patents and from which CRC collected substantial royalties. By its announced plan to manufacture Li/I power sources internally, Medtronic would have

2. Of course, the mere offer of a license by a patent holder without more would not be sufficient to create a reasonable apprehension of impending litigation. *Cosden Oil & Chemical Co. v. Foster Grant Co.*, 432 F.Supp. 956, 958 (D.Del.1977).

significantly decreased royalty income to CRC. Moreover, it appears that pursuant to a third party infringement clause in CRC's license agreement with Greatbatch, unless CRC brought suit to protect its patents against third party infringement, royalties due CRC by Greatbatch would have decreased to one-half of the existing amount and the minimum annual royalties due would have dropped from $125,000 to zero.[3] Thus, any plan by Medtronic to manufacture internally Li/I batteries of the type marketed by CRC posed a direct and serious threat to CRC's financial and business interests. Where the business interests of the parties to a declaratory judgment action are thus disparate, the likelihood of an infringement action is amplified. Cf. *Dyform Concrete (Prestressed) Ltd. v. Spiroll Corp. Ltd.*, 370 F.Supp. 290, 291 (D.Minn.1971) (where parties to a declaratory judgment action are engaged in actual competition the threat of a possible infringement action is, as a practical matter, amplified).

A second factor of consequence to the Court's analysis is CRC's apparent awareness during the relevant time period that Medtronic was proceeding with plans to produce Li/I batteries and that there was a good probability, if not an absolute certainty, that Medtronic's batteries would use technology covered by CRC's patents. It is undisputed that Medtronic advised defendant CRC at an early date of its intention to manufacture its own Li/I power sources. By March of 1976 Medtronic had entered into a license agreement with Greatbatch whereby Medtronic was to receive from Greatbatch technology and patent licenses to commence its manufacture of Li/I batteries. Personnel of Medtronic so informed CRC. As a licensee under CRC's patents, Greatbatch paid royalties to CRC in connection with batteries it manufactured. It was Greatbatch's batteries that Medtronic intended to produce and CRC was so advised. When told of the Medtronic/Greatbatch agreement, CRC president Hulme and general manager Tepper expressed to Medtronic their concern that Medtronic would need a license to the extent the Greatbatch batteries used technology covered by CRC's patents. The possibility that Medtronic batteries might infringe CRC patents obviously did not escape the attention of CRC officials.

That Medtronic subsequently pursued actively a license agreement with CRC would further suggest Medtronic's own recognition and acknowledgment that, in fact, its batteries were dependent upon information purportedly covered by CRC's patents. Although Mr. Hulme has indicated in an affidavit that as late as February 1977 he was unsure whether Medtronic was proceeding with plans to produce batteries protected by CRC's patents, it is difficult to imagine that Medtronic would have been as interested as it was in negotiating a license agreement unless it thought that there would be grounds for a possible infringement action in the absence of such an agreement. That this logical deduction would not have been

**3.** Defendant CRC disputes plaintiff's assertion that there was an economic incentive for CRC to enforce its Li/I patents against Medtronic by reason of the third party infringement clause contained in the original license agreement between Greatbatch and CRC. Defendant contends that while the initial license arrangement contained such a clause, that agreement provided that the third party infringement clause was to come into force only where infringement denied Greatbatch the "full benefit of its exclusive license." Greatbatch's initial licensee agreement with CRC was subsequently modified to become a non-exclusive license arrangement. CRC submits that, therefore, the enforcement clause which makes reference to an exclusive license no longer had effect. Plaintiff Medtronic has pointed out in response, however, that the supplemental agreement under which Greatbatch became a non-exclusive licensee makes modifications in the original agreement by reference to specifically enumerated articles. Article VIII of the original agreement, containing the third party infringement provision, is left untouched by the supplemental agreement. The Court finds persuasive the argument that if Article VIII was to have been deleted, there would have been language to that effect in the supplemental document. The fact that Article VIII in the original document uses the words "exclusive license" appears to be of little significance considered alone since CRC's protection of its patents against outside infringement would seem to be as important to a licensee operating under a non-exclusive license as to one whose license was exclusive.

made as well by CRC seems inconceivable. In this regard, it is significant that in the same affidavit in which he disclaims knowledge of Medtronic's intentions regarding battery production, Mr. Hulme states that he was "operating under the distinct impression that Medtronic *urgently* wanted the proposed license and was *actively soliciting* it." (Hulme Affidavit at ¶ 25) (Emphasis added).

Assuming arguendo that CRC did not know or even suspect that Medtronic was using processes covered by its patents, the Court does not believe this fact alone would preclude the finding of an actual controversy where as here plaintiff, having conducted its own careful investigation, reasonably concludes that its product may fall within the scope of defendant's purported patent protection and where, furthermore, plaintiff has good reason to expect that defendant will attempt to enforce its claimed patent rights. *Cf. Dewey & Almy Chemical Co. v. American Anode, Inc.*, 137 F.2d 68 (3rd Cir. 1943) (actual controversy existed where patentee had made claims concerning the scope of its patent sufficiently broad to cover plaintiff's process even though patentee alleged that it did not even know that plaintiff used such a process). *See also Super Products Corp. v. D P Way Corp.*, 546 F.2d 748 (7th Cir. 1976) (plaintiff could reasonably expect infringement litigation and there thus existed a justiciable controversy where there was a significant similarity between plaintiff's product and defendant's patented product and where defendant had indicated its determination to defend its rights).

A comprehensive review of defendant's conduct in this case indicates that CRC's actions amply led to the reasonable conclusion on plaintiff's part that CRC was completely serious about protecting its Li/I patents and would not hesitate to resort to litigation to do so. The record is replete with numerous instances in which representatives of defendant informed plaintiff as well as others in the industry that defendant's Moser-Schneider patents were strong and enforceable. Mr. Hulme, CRC's president, has indicated in an affidavit that he considered the patents to be "basic and pioneer[ing]." (Second Hulme Affidavit at ¶ 6). Indeed, even when confronted with materials supplied at defendant's request by plaintiff suggesting grounds for questioning the patents' validity, defendant persisted in asserting its complete faith in their enforceability. While a mere request by a patentee for information on which to make a determination as to possible infringement does not create an actual controversy (*American Needle & Novelty Co., v. Schuessler Knitting Mills, Inc.*, 379 F.2d 376 (7th Cir. 1967), it is significant in this case that having obtained and reviewed such information, defendant still persisted in pursuing a license arrangement with plaintiff and in demanding royalty payments for use of its patents. By both words and conduct, then, defendant conveyed to plaintiff the clear impression that it intended to defend its rights. This factor, when combined with the two factors previously discussed, leads the Court to conclude that at the time this action was commenced plaintiff had a "reasonable apprehension" that it would be subject to an infringement suit if it continued its present course of conduct. This apprehension in turn establishes a "case of actual controversy" and makes this action ripe for decision under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.[4] *Sher-*

4. The Federal Declaratory Judgment Act does not itself confer upon the Federal courts an independent basis of subject matter jurisdiction but instead provides only a procedural remedy that can be used when jurisdiction otherwise exists. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Medtronic, Inc. v. American Optical Corporation, supra*, at 1330. In the instant case plaintiff has alleged that subject matter jurisdiction exists on two separate grounds: (a) the action involves a Federal question because it arises under the patent laws of the United States, 28 U.S.C. §§ 1331 and 1338; and (b) the matter in controversy exceeds $10,000 and arises between parties that are citizens of different states, 28 U.S.C. § 1332. Defendant's claim of lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), appears to be predicated solely on the absence of a justiciable controversy rather than on any alleged failure to satisfy the technical requirements of these

*wood Medical Industries, Inc. v. Deknatel Inc., supra,* at 727. Therefore, defendant CRC's first motion to dismiss must be denied.

To a certain extent defendant CRC's second motion for dismissal is bootstrapped onto its first. At the outset, defendant advances the obvious proposition that the Court cannot assert personal jurisdiction over a foreign corporation under Minnesota's long arm statutes in the absence of a cause of action against that corporation. Defendant then goes on to assert that since there was no controversy between it and Medtronic at the time this action was commenced, there was no cause of action and hence no basis for jurisdiction. In finding the existence of an actual controversy, the Court has disposed of this aspect of defendant's argument. Defendant does not stop here, however, but contends as well that Minnesota's long arm statutes are insufficient to establish personal jurisdiction in the instant case because plaintiff's cause of action, if it exists, does not "arise out of" any of the statutory contacts with the State specified in either of Minnesota's two long arm statutes.

In the instant case, service of process has been made pursuant to both Minn.Stat. § 303.13, subd. 1(3), and Minn.Stat. § 543.-19.[5] Since Minn.Stat. § 543.19 is generally conceded to be the more liberal of the two statutes, however, the Court confines its analysis of the personal jurisdiction issue to this provision and offers no opinion as to the appropriateness of service under Minn.

Stat. § 303.13. Minn.Stat. § 543.19 provides any Court in this State with personal jurisdiction over a foreign corporation which, among other things, transacts any business within the State, as long as the cause of action "arises from" the corporation's enumerated contact with the State.[6] Plaintiff asserts that personal jurisdiction over defendant CRC may be properly asserted under this statute on two grounds. First, plaintiff contends that, under prevailing caselaw, because service of process was made consistent with due process, it is not necessary to tie jurisdiction to any of the specific provisions in Minn.Stat. § 543.19. *See Japan Gas Lighter Association v. Ronson Corp., supra,* at 231–32. Plaintiff finds support for this position in pronouncements of the Minnesota Supreme Court to the effect that the Legislature in enacting Minnesota's long arm statutes intended "to extend jurisdiction of [the State's] courts to the maximum limits consistent with constitutional limitations." *Hunt v. Nevada State Bank,* 285 Minn. 77, 172 N.W.2d 292, 304 (1969), *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970). *See also Ellwein v. Sun-Rise, Inc.,* 295 Minn. 109, 203 N.W.2d 403 (1972); *Mid-Continent Freight Lines, Inc. v. Highway Trailer Industries, Inc.,* 291 Minn. 251, 190 N.W.2d 670, 673 (1971). Defendant argues vigorously in response that the language of the statute must be closely adhered to and that before personal jurisdiction can be found to exist under Minn.Stat. § 543.19, the cause of ac-

---

statutory jurisdictional grounds, and the Court has so treated it.

**5.** Process was originally served upon defendants through the Secretary of State pursuant to Minn.Stat. § 303.13. Several months later personal service was also made pursuant to Minn. Stat. § 543.19 (Solum Affidavit at ¶ 1). Since service pursuant to § 543.19 has now been made, the Court considers moot claims initially raised by defendant concerning plaintiff's failure to effect proper service under § 543.19.

**6.** Minn.Stat. § 543.19 provides in pertinent part:

"Subdivision 1. As to a cause of action arising from any acts enumerated in this subdivision, a court of this state with jurisdiction of the subject matter may exercise personal jur-

isdiction over any foreign corporation or any nonresident individual, or his personal representative, in the same manner as if it were a domestic corporation or he was a resident of this state. This section applies if, in person or through an agent, the foreign corporation or nonresident individual:

\*  \*  \*  \*  \*  \*

(b) Transacts any business within the state,

\*  \*  \*  \*  \*  \*

"Subdivision 3. Only causes of action arising from acts enumerated in subdivision 1 may be asserted against a defendant in an action in which jurisdiction over him is based upon this section."

tion must be found to "arise from" one of the enumerated acts. Plaintiff counters with the second ground on which it asserts that personal jurisdiction is proper; that is that, in any event, the "arising from" requirement of Minn.Stat. § 543.19 is satisfied in the instant case.

Substantial case support exists for plaintiff's first argument that the "arising from" language of Minn.Stat. § 543.19 does not preclude the assertion of jurisdiction where defendant's contacts with this State, although unrelated to plaintiff's cause of action, are nonetheless so significant as to make it fair and reasonable that defendant appear in this forum. In *Hardrives, Inc. v. City of LaCrosse*, 307 Minn. 290, 240 N.W.2d 814, 819 (1976), for example, the Minnesota Supreme Court affirmed jurisdiction under Minn.Stat. § 543.19, stating:

> "Because the contacts present in this case are substantial with respect both to quantity and to quality, it is not essential to find that they are also related to the cause of action."

Similarly, in *Franklin Manufacturing Co. v. Union Pacific Railroad Co.*, 297 Minn. 181, 210 N.W.2d 227, 230 (1973), the Court asserted:

> "That plaintiff's asserted cause of action did not arise out of defendant's contacts with Minnesota is not unimportant. Were it otherwise, the issue would probably not have been raised. This nevertheless does not prevent this State from taking jurisdiction, providing the other factors weigh sufficiently in favor of it."

That the importance of the "arising from" requirement has not yet been fully resolved, however, is suggested by the opinion of the Federal District Court in *Tunnell v. Doelger & Kirsten, Inc.*, 405 F.Supp. 1338 (D.Minn.1976) (Devitt, J.). In *Tunnell* the Court denied jurisdiction under Minn.Stat. § 543.19 on grounds that plaintiff's cause of action did not arise from any of the alleged acts asserted to have constituted the transaction of business by defendant in Minnesota. In so doing, the Court noted:

> "Plaintiff argues that defendant's business transactions in this state are suffi-

cient 'minimum contacts' to satisfy the due process requirements for in personam jurisdiction over a nonresident defendant. . . . However, plaintiff's argument ignores the express statutory requirement of a nexus between the cause of action asserted and the acts of a non-resident which can confer jurisdiction under the Statute." *Id.* at 1340.

This Court does not find it necessary to decide whether the "arising from" requirement must be met in all instances, because in the present case the Court is convinced that plaintiff's cause of action arose from defendant's transaction of business in Minnesota and, therefore, personal jurisdiction was properly obtained in accordance with Minn.Stat. § 543.19, subd. 1(b). The standard to be used in determining whether a cause of action has arisen from the transaction of business in Minnesota is somewhat obscure. This Court is aware of no Minnesota cases that focus precisely on the meaning of the "arising from" language contained in Minn.Stat. § 543.19. The Eighth Circuit, however, had indicated in connection with a declaratory judgment involving a claim of patent invalidity that it is "proper to employ a liberal construction in determining whether the cause of action has arisen from the transaction of business in Minnesota." *B & J Manufacturing Co. v. Solar Industries, Inc.*, 483 F.2d 594, 598 (8th Cir. 1973). Some additional guidance may be gleaned from *Koplin v. Thomas, Haab & Bates*, 73 Ill. App.2d 242, 219 N.E.2d 646 (1966), an Illinois case interpreting the long arm statute which served as the origin of Minnesota's own statute. The interpretation of the Illinois statute is thus useful in interpreting the Minnesota provision. *Hunt v. Nevada State Bank*, 285 Minn. 77, 172 N.W.2d 292 (1969). In *Koplin* the Court stated:

> "The defendant's construction of § 17(3) would, in effect, limit the exercise of jurisdiction under § 17 to cases where a jurisdictional act of the defendant is the act of which the plaintiff complains. This disregards the purpose of subsection (3). Its purpose is to insure that there is

a close relationship between a nonresident defendant's jurisdictional activities and the cause of action against which he must defend. In the instant case, the phrase 'arising from' requires only that the plaintiff's claim be one which *lies in the wake of the commercial activities by which the defendant submitted to the jurisdiction* of Illinois's courts. . . . the cause of action *arose from the consequences* arising from these [activities] . . . ." 219 N.E.2d at 651 (Emphasis added).

*See also Northwestern National Bank of St. Paul v. Kratt,* 303 Minn. 256, 226 N.W.2d 910, 914 (1975), in which the Minnesota Supreme Court held that an Illinois guarantor who had guaranteed a loan made by a Minnesota bank on property in Minnesota, who discussed a mortgage over the phone with bank officials, and who attended meetings concerning the transaction in Minnesota, had transacted business in this State within the meaning of Minn.Stat. § 543.19, subd. 1(b), despite the fact that his activities of transacting business did not, in a strict sense, give rise to the cause of action based on the signing of the guarantee itself.

There can be no doubt that the controversy out of which arose the cause of action in the instant case developed as a consequence of activities by defendant CRC that occurred wholly or in part in Minnesota. Nor can it be disputed that the controversy "lies in the wake" of CRC's continuous and long-term commercial activities aimed at furthering the development and sale of lithium iodine power sources to the pacemaker industry in Minnesota. A review of the facts in this case indicates that the controversy between Medtronic and CRC has, from its inception, been fostered and fueled by contacts occurring in Minnesota. Beginning in the early 1970's, CRC solicited substantial sales of its products in Minnesota. It also engaged the services of Wilson Greatbatch, Ltd., as its agent to promote sales of its Li/I power cells to Minnesota pacemaker manufacturers on a continuous basis. It was as a direct result of the promotional activities of CRC or its agent in Minnesota that Medtronic's initial awareness of the potential for lithium iodine battery use in cardiac pacemakers developed. Moreover, CRC's solicitation of orders (either directly or through its agent) led eventually to the delivery and sale to Medtronic and other cardiac pacemakers in Minnesota of Li/I power sources covered by the disputed patents.

The record indicates further that from time to time CRC officers and other personnel voluntarily traveled to Minnesota to consult with Medtronic about the development of Li/I power sources for use in cardiac pacemakers. These discussions led ultimately to a technology exchange agreement and an agreement aimed at development of experimental cells involving CRC's Moser-Schneider patents for use in Medtronic pacemakers. Beginning in 1976 and extending through May of 1977, license negotiations concerning these same patents transpired between Medtronic and CRC with attendant meetings held in the State of Minnesota and numerous written proposals and forms of license agreements being transmitted from CRC to Medtronic in Minneapolis. Finally, CRC's officials on several occasions, either personally or by mail, informed Medtronic representatives in Minnesota of CRC's property rights in its Li/I patents and of CRC's willingness to enforce those rights. It was this expression of intent to defend its patents, coupled with Medtronic's growing doubt as to their validity, which, of course, eventually triggered this litigation.

When confronted with similar facts, this and other Courts have in the past found a transaction of business by the defendant in a declaratory judgment action sufficient to invoke long arm jurisdiction under Minn. Stat. § 543.19, subd. 1(b). In *Hanson Silo Company v. Even-Flo Silage Distributor, Inc.,* 4–72–Civil 612 (May 23, 1973), this Court sustained jurisdiction where:

"The Court finds that where counsel for the patent owners and patent licensees sends a letter to a Minnesota corporation alleging patent infringement and where that licensee is a foreign corporation which sends its sales representative to

Minnesota on a regular basis to solicit sales of the patented item, establish new contacts and clients, serve as damage distributors, and stock parts inventories, which sends its officers and sales managers to trade shows within the State, and which distributes literature advertising said patent within the State, that foreign corporation is amenable to process under the Minnesota long-arm statute."

Similarly, in *Dyform Concrete Ltd. v. Spiroll Corp., supra,* this Court stated:

"The Court also concludes that the requirement of the Minnesota Statute that the cause of action arises from the contacts of defendant with this State is here satisfied. Machinery which defendant has sold, is marketing, and services in Minnesota is covered by the patents upon which a declaratory judgment is here sought. The machinery located in Minnesota not only bears the patent numbers relevant here, but those numbers are also mentioned in the license agreements existing between defendant and its Minnesota licensees." 370 F.Supp. at 292–293.

Finally, in *B & J Manufactr .ing Co. v. Solar Industries, Inc., supra,* the Eighth Circuit sustained the lower court's finding of jurisdiction where the defendant had sent letters to the plaintiff in Minnesota in which it advised the plaintiff to refrain from infringing on its patent and further threatened a suit for infringement against the plaintiff if it refused to discontinue the manufacture and sale of its competing product. In that case the Court found it significant that defendant had transacted a substantial amount of business in Minnesota over the years involving its products, though defendant had not directly or indirectly sold within the State the specific product over which it claimed patent pro-

tection. In sustaining jurisdiction, the Eighth Circuit focused on the fact that:

"The defendant advertised its products in national publications which were distributed in Minnesota, and it sold a number of its other products to independent distributors located in the state. It maintained 'trouble shooters' who were available to visit the state when necessary to aid users of the firm's products, and the firm also repaired its products, though these had to be shipped to the firm's Illinois office for such service. Furthermore, it is significant that prior to the defendant's acquisition of the patent, its assignor had threatened the plaintiff with an infringement suit; that the assignor had sold the disputed product in Minnesota; and that the assignor and the defendant, as well, had discussed the question of licensing the patent with the plaintiff." 483 F.2d at 598.

Defendant contends that *Dyform Concrete* and *B & J Manufacturing* are distinguishable from the instant case because in those cases the plaintiff and the defendant patent holder were competitors. Defendant submits that in the instant case there is no competition between Medtronic and CRC. Defendant further contends that licensing negotiations should not be considered the basis for the assertion of personal jurisdiction, citing this Court's opinion in *Conwed Corporation v. Nortene, S. A.,* 404 F.Supp. 497 (D.Minn.1975).[7] In *Dyform Concrete* this Court considered the fact that plaintiff and defendant were competitors to be significant in connection with its determination as to the existence of a justiciable controversy since it appeared to the Court more likely that an infringement action would be brought where the parties were in actual competition. 370 F.Supp. 290–91.

---

7. Specifically, defendant relies on the Court's conclusion in *Conwed* that:

"Minnesota, along with other jurisdictions, has long had a policy favoring the compromise of disputes without resort to litigation . . . . The policy has led to a rule excluding the admission of evidence of such compromises, and the rationale was well stated by the Eighth Circuit in *Moffitt-West Drug Co. v. Byrd,* 92 F. 290, 292 (8th Cir. 1899):

\* \* \* \* \* \*

On the facts of this case, the policy favoring compromise is closely related to the courts' traditional aversion to 'jurisdictional traps.' Together the two policies are broad enough to preclude the use of the St. Paul settlement meeting to establish jurisdiction, and the Court is satisfied that the Minnesota Supreme Court would so interpret M.S.A. § 543.19 Subd. 1(b)." 404 F.Supp. at 504.

The fact of competition was not crucial in finding personal jurisdiction once an actual controversy had been found, however. It was enough to satisfy the "transacting business" requirement of Minn.Stat. § 543.19, subd. 1(b), that defendant had sold products produced under the disputed patents in this State.

With respect to *B & J Manufacturing*, although the patent holder in that case had had numerous business contacts with Minnesota, the only apparent contacts with the State directly related to the patent at issue were letters threatening an action for infringement sent to plaintiff in Minnesota by the defendant. In that context, the Court found it necessary to ascertain whether the sending of these letters alone was enough to constitute the transaction of business in the State. The rationale underlying the Court's ruling on this matter appears to have been that if plaintiff and defendant were competitors, then the sending of such letters might have had as one purpose the deterring of future sales by plaintiff in Minnesota and the improvement of defendant's economic and marketing position. By contrast, if no competition existed, defendant's sole purpose in sending the letters would presumably have been the protection of its patent. The Court apparently felt letters sent for the latter purpose should not be held to constitute "transacting business" in this State so as to subject defendant to long arm jurisdiction.

In the instant case it is abundantly clear that defendant's contacts with Minnesota involving the sale and promotion of its patented products to Medtronic and to other manufacturers of cardiac pacemakers in Minnesota were undertaken for economic and business purposes. Thus, defendant was clearly "transacting business" directly related to the patents whose validity is now contested. Beyond this, it seems evident to the Court that defendant's communications with plaintiff concerning the enforceability of its patents could be regarded as having been initiated in part for business reasons and thus could form an independent basis for finding that defendant transacted business in this State. It is undisputed that plaintiff and defendant were not competitors in the sense that they were selling Li/I batteries in the same market at the time this action was commenced. As the Court has indicated previously, however, plaintiff's plans to manufacture internally batteries over which defendant claimed patent protection posed a direct threat to defendant's financial position since plaintiff was a large purchaser of batteries from defendant's licensee Wilson Greatbatch, Ltd. from whom defendant derived substantial royalty payments. The business interests of plaintiff and defendant were disparate and could in that sense be considered competitive. Defendant's interest in retaining plaintiff as a buyer for its batteries provided it with an obvious business incentive to take steps to deter plaintiff from manufacturing Li/I batteries on its own or to ensure at least that plaintiff produced such batteries only under a license from defendant.

Finally, defendant's reliance on *Conwed* for the proposition that the Court should not predicate a finding of personal jurisdiction on license negotiations involving a disputed patent is misplaced. In *Conwed* this Court granted defendant's motion to dismiss where the *only* contacts of defendant with the forum were a single meeting in Minnesota to discuss ownership of the patents in question and a letter from defendant to the plaintiff, mailed at the plaintiff's request, setting out defendant's position with respect to plaintiff's continued manufacture of the patented item. The Court found that to subject defendant to personal jurisdiction where its only contact with the forum consisted of communicating its concern over its patent rights to a potential infringer would offend due process notions of fairness and substantial justice. The determinant factor in *Conwed* was the *de minimis* nature of defendant's contacts with the forum. In this regard, the facts of *Conwed* are clearly and obviously distinguishable from those in the instant case.

Not only does this Court find that defendant CRC transacted business in Minnesota within the meaning of Minn.Stat.

§ 543.19, it finds as well that the assertion of personal jurisdiction over defendant would not violate defendant's right to due process. *See Aftanase v. Economy Baler Company*, 343 F.2d 187 (8th Cir. 1965).[8] It is clear on the record that the quantity, quality and nature of the defendant's contacts with the jurisdiction are substantial. Defendant has voluntarily engaged on numerous occasions in business transactions in this State involving the promotion and sale of products produced under the patents at issue here as well as other products. For reasons discussed above, the Court also finds that defendant's contacts are sufficiently connected with this cause of action to satisfy due process. Furthermore, Minnesota most certainly has an interest in providing a forum for a resident threatened with an action for patent infringement. Finally, while defendant might find it more convenient to litigate this case elsewhere, the Court must consider the convenience of all parties. Since no exceptional hardship is suffered by the defendant having to litigate in Minnesota, the Court sees no reason to dismiss this action.

■ In contrast to the first two motions, the remaining motions before this Court can be disposed of with relative ease. The first of these motions is defendant MSA's motion to dismiss for lack of subject matter jurisdiction. MSA contends that as to it there can be no subject matter jurisdiction since it neither owns nor controls the patents in dispute and thus is incapable of creating a controversy with respect to such patents with Medtronic or any other party. Having reviewed the record, the Court agrees and therefore finds no necessity for retaining MSA as a party to this litigation. Medtronic does not dispute that CRC is the sole owner of the patents in suit nor does it assert that MSA is licensed under the patents. Instead Medtronic alleges in its complaint that MSA "so controls and dominates Catalyst Research as to

make Mine Safety the true party in interest and Catalyst Research the alter ego of Mine Safety and its nominee." Medtronic, in essence, asks this Court to find subject matter jurisdiction by disregarding the corporate separateness between MSA and CRC.

■ Under prevailing caselaw, a court will "pierce the corporate veil" only in exceptional circumstances where to do so is necessary to prevent injustice or fraud. *See, e. g., United States v. Martin*, 337 F.2d 171, 175 (8th Cir. 1964) ("The corporate entity will be disregarded only under exceptional circumstances such as where the corporation serves no legitimate business purpose and is used only as an intermediary to perpetrate fraud or promote injustice."); *National Bond Finance Co. v. General Motors Corp.*, 238 F.Supp. 248, 255 (W.D.Mo. 1964), *aff'd*, 341 F.2d 1022 (8th Cir. 1965) ("[W]hen a corporation is so dominated by another corporation, that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, then the corporate veil of the dominated corporation will be disregarded, if to retain it results in injustice."). *Accord Omaha Pollution Control Corp. v. Carver-Greenfield Corporation*, 413 F.Supp. 1069, 1091 (D.Neb.1976).

■ In the instant case the Court can conceive of no possible injustice or unfairness to Medtronic that will result from the dismissal of MSA as a party defendant. Medtronic is seeking a declaration of patent invalidity and noninfringement. Neither of these remedies requires MSA's presence as a party. Nor is MSA's presence required for purposes of discovery since any relevant information possessed by MSA concerning the conception, reduction to practice and development of the technology embodied in the patents at issue would be available to Medtronic through Fed.R.Civ.P. 45. Finally, MSA's presence is not required for financial reasons because Medtronic's com-

---

**8.** In *Aftanase*, the Eighth Circuit set forth five factors to be considered in assessing the permissibility of exercising long arm jurisdiction consistent with due process: (1) the quantity of the contacts with the forum state, (2) the nature and quality of the contacts, (3) the source and connection of the cause of action with those contacts, (4) the interest of the State in providing a forum, and (5) the convenience of the parties.

plaint does not seek money damages and, in any event, CRC is apparently operating on a sound financial basis. In short, the Court sees no need to disregard the corporate separateness between MSA and CRC because any relief warranted in this lawsuit can be granted without MSA's continued presence as a defendant.

Finally, the Court considers Medtronic's motion for an award of attorneys' fees incurred in connection with its opposition to CRC's motion to dismiss for lack of personal jurisdiction. Medtronic asserts that such an award is justified because CRC has abused the judicial process by bringing its motion in contravention of obvious prevailing law and in disregard of the clear facts of this case.

As plaintiff acknowledges, the prevailing "American Rule" is that parties to civil actions are required to bear their own attorneys' fees. An exception to this rule has been recognized, however, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *See, e. g., Browning Debenture Holders' Comm. v. Dasa Corp.*, 560 F.2d 1078 (2d Cir. 1977); *In re Boston and Providence Railroad Corp.*, 501 F.2d 545 (1st Cir. 1974). It is upon this "bad faith" exception that Medtronic relies. In *Browning Debenture Holders' Comm. v. Dasa Corp., supra*, the Court defined an action brought in bad faith as one involving a claim "entirely without color" which is asserted "wantonly, for purposes of harassment or delay, or for other improper reasons." 560 F.2d at 1088. In the opinion of this Court, defendant CRC's motion to dismiss for lack of personal jurisdiction raised legitimate questions concerning the scope and application of Minnesota's long arm statute, Minn.Stat. § 543.19, that cannot be said to be "entirely without color." Therefore, plaintiff Medtronic's motion for attorneys' fees must be denied.

In summation, based upon the foregoing analysis,

IT IS ORDERED:

1. That defendant Catalyst Research Corporation's motion to dismiss for failure to state a claim upon which relief can be granted, or, in the alternative, for lack of subject matter jurisdiction be denied.

2. That defendant Catalyst Research Corporation's motion to dismiss for lack of personal jurisdiction be denied.

3. That defendant Mine Safety Appliances Company's motion to dismiss for lack of subject matter jurisdiction be granted.

4. That plaintiff Medtronic, Inc.'s motion for an award of attorneys' fees be denied.